## THE STATE v. JACOB SCHMITT.

1. An indictment for libel charges defendant with publishing an article in the German language and set out a translation thereof into English. The article related to an aspirant to the office of postmaster of Newark, who also was or had been a congressman. In a prefatory statement it was averred that W. H. F. F. had been a congressman and was an aspirant to that office. The indictment charged that the article reflected on him. *Held,* that the prefatory statement justified this charge, although it was not averred that W. H. F. F. was the only congressman who was an aspirant to that office.

2. The article set out the procuring of a pension by a congressman in a case of fraudulent enlistment, and afterward used the following language, which was alleged to be aimed at W. H. F. F., viz.: " Up to date, President Cleveland has not seen fit to remove General Ward on the above charges, and to tie hungry spoils-hunters to the crib, who have no other recommendation than that as faithful party menials they have only in their own interest made considerable noise, who have never made themselves useful to their country and only have aimed to very doubtful pension grants and anti-convict labor bills to catch votes." *Held,* that this language was capable of being construed as charging that a public representative, for the purpose of ob-

taining votes, had intentionally pressed for the payment of public money on claims, the foundation of which · was very questionable; that such a meaning was defamatory, and a conviction on that charge would support a judgment.

Motion to quash indictment.

Argued at February Term, 1886, before Justice MAGIE.

For the motion, *Carl Lentz* and *Samuel Kalisch*.

*Contra, Oscar Keen*, prosecutor of the pleas.

MAGIE, J.   The indictment objected to contains one count,. and charges the defendant with having published in a public newspaper, printed in the German language, a libelous article, reflecting on William H. F. Fiedler.   It sets out the article in the German language and follows it with a translation into English, accompanied with innuendoes declaring its meaning.

By the rules of criminal pleading, an indictment for libel must be based on a publication which appears on its face to be libelous in its application to the person alleged to be libeled, or it must set out such extrinsic facts as show the publication to be susceptible of a defamatory meaning directed at that person, and in the latter case the indictment must connect the words published with the extrinsic facts averred by proper innuendoes so as to exhibit a libelous meaning in reference to the person named.   *State* v. *Mott*, 16 *Vroom* 494.

It is contended that, tested by these rules, this indictment is defective.

In considering this question, the English translation of the article must be accepted as containing the true meaning of the German words alleged to have been published.

This motion is addressed to the discretion of the court, and ought not to be successful, unless it is manifest that no judgment could be rendered on the indictment.   *State* v. *Dayton*,

3 *Zab.* 49; *State* v. *Hagaman,* 1 *Green* 314; *State* v. *Beard,* 1 *Dutcher* 384.

Defendant first insists that there is nothing on the face of the indictment to show that the article reflects on Mr. Fiedler, or to justify the innuendoes that its statements are libels upon him.

As to many of the innuendoes, the contention is well founded. But, if a single charge be well pleaded, this motion cannot prevail.

The article in question is entitled, " Postmaster Ward and His Opponents." It avers that attempts were being made to remove from office the postmaster of Newark, and that it had been charged that he had permitted letter-carriers to act as supervisors in revising the lists of registered voters. In response, the article alleges that the carrier's services had been rendered after the completion of their regular duties, and that their whole compensation amounted to about $100. It then proceeds : " What does this amount to, in comparison to the wholesale pensions drawn from the United States treasury by an aspirant for Postmaster Ward's position ? From all the cases, let us take one case." It then narrates the circumstances of a pension obtained " through the interference of a congressman," and adds : " Let us ask, in conclusion, if a man, as Postmaster Ward, gives his consent that the letter-carriers see to the purity of the ballot-box, without conflicting with the business of the post-office management, and receive payment therefor, whether this is more to be censured than the doings of an aspirant to the office of postmaster, who, to make himself popular, calls to his aid the United States treasury."

Upon the face of these statements, it is obvious that reference is made to an unnamed person, who was an aspirant to the position occupied by Postmaster Ward, and who was, or had been, a congressman.

In a prefatory statement the indictment avers that Mr. Fiedler had been a member of the house of representatives from March 4th, 1883, to March 4th, 1885, and that, at the date of the publication, William Ward was the postmaster at

Newark, and Mr. Fiedler was an applicant and aspirant for that office.

But it is objected that the innuendoes which point the meaning of these statements to Mr. Fiedler are not justified, because it is not averred that he was the only congressman, or ex-congressman, who also aspired to that office.

But such a degree of precision is not required. In the quaint words of Lord Coke, " certainty, to a certain intent in general," is all that is required in making a criminal charge. Mr. Chitty construes this to mean what, upon a fair and reasonable construction, may be called certain, without recurring to possible facts which do not appear. 1 *Chitty on Pleadings* 213. What is requisite is to set out such circumstances as will show that a crime is charged, and apprise the defendant of what he is called to answer.

In *Wakley* v. *Healey*, 7 *M., G. & S.* 591, a declaration stated, by way of inducement, that plaintiff was secretary to a committee of poor-law medical officers. In one count it set out an article, cautioning the medical officers of the poor-law unions not to suffer that committee to meddle with their affairs, and added : " We would exort the medical officers to avoid the traps set for them by *desperate adventurers*." These words were averred, by an innuendo, to refer to plaintiff and others. On error in the Exchequer Chamber it was contended that it was not properly shown that the words related to plaintiff, but the count was sustained without hearing counsel in reply.

In *Fanu* v. *Malcolmson*, 1 *H. of L. Cas.* 637, a declaration averred that plaintiff owned a factory in Ireland, and charged that defendant published, concerning plaintiff and his factory, an article which stated that in " some of the Irish factories cruelties were practiced." The innuendoes declared that by this language plaintiff's factory was meant. The declaration was held good.

The present case is stronger. On the face of this indictment it is apparent that Mr. Fiedler may have been the person aimed at by the article. The averment that he was meant

makes out the crime if the imputation is defamatory. The averment must be proved, but if proved, and a conviction should follow, judgment could doubtless be pronounced on the indictment.

It is next contended by defendant that this part of the article contains no libelous matter.

To exhibit the point presented, the translation of this portion of the article is set out:

"What does this amount to in comparison to the wholesale pensions drawn from the United States treasury by an aspirant for Postmaster Ward's position? From all the cases, let us take one case.

"In October, 1861, a man was sworn in at Trenton, in Company L, Ninth Regiment, Volunteers, who was at that time fifty-six years of age. A younger man was examined by the medical examiner under his name, otherwise he could not have been sworn in, by reason of being over age. After having served for some time, and having become disabled on account of stiffness in the limbs, this man received his discharge on account of disability. Afterward the same old man enlisted in the Thirty-ninth Regiment, New Jersey Volunteers, and received a nice bounty to be discharged again in a short time for disability. About two years ago a pension agent called on the writer of these lines and requested him to swear to an affidavit that this particular old man entered the Ninth Regiment well and sound, contracted there a sickness which made him unable, during the rest of his life, to earn a livelihood, and finally led to his death. When the pension agent was informed of the facts, he remarked, ' That is a hard case,' and left. Six months afterwards it was made known in all the papers that the widow of the old man had received pension money amounting to over $2200, through the interference of a congressman. The above is one case of many not less significant. Let us ask in conclusion," &c.

By innuendoes interspersed through these words, their meaning is averred to be that the enlisted man mentioned was accepted by the military authorities through fraud ; that he

was not then well and sound, and therefore neither he nor his widow was entitled to a pension for disability, and that Mr. Fiedler, "knowing the premises, knowingly aided in the prosecution of a fraudulent claim for a pension," and did "knowingly, by unlawful, corrupt and fraudulent methods, obtain the granting of said claim."

The innuendo that the enlisted man procured his acceptance in the Ninth Regiment by fraud, is entirely justified by the words. While this fact would not perhaps debar him or his widow from a pension for a disability actually received during his service, under *Rev. Stat. U. S., subd.* 1, §§ 4693, 4702, and while there is no direct statement that he was not well and sound when enlisted, or that his disability arose from a cause antedating his enlistment, yet the insinuations to this effect are so strong that I am by no means sure that it would not be proper to leave to a jury to say whether the imputed meaning, or some part of it, should not be attributed to the words.

So, there is no language expressly showing knowledge of the fraud or a fraudulent or corrupt connection with the prosecution of this claim. Yet it is apparent that the point of comparison made between the money drawn from the treasury by the carriers under Postmaster Ward and that drawn by the pension claim, through the interference of the aspirant for his office, would be complete by a mere statement of the drawing of the pension. But the writer of the article thought proper to set out the circumstances in such detail and with such insinuation that it may not be a strained inference to conclude that it was intended to convey the idea that the connection of the congressman with the procuring of this pension was at least improper. But it is unnecessary to determine whether these words bear the meaning attributed to them by the innuendoes, if the words in fact bear a libelous meaning. In that case innuendoes which are more extensive than the natural meaning of the words, or even repugnant to that meaning, should be rejected. The authorities for this proposition were examined and are cited in *State* v. *Mott, supra.*

State v. Schmitt.

In considering whether, apart from the libelous meaning attributed by the inuendoes, there is not some libelous imputation made in this article, the whole of it should be examined. Following the words previously quoted (after only one intervening sentence) occur these words: "Up to date President Cleveland has not seen fit to remove General Ward on the above charges, and to tie hungry spoils-hunters to the crib, who have no other recommendation than that as faithful party menials they have only in their own interest made considerable noise, who have never made themselves useful to their country, and only have aimed to *very doubtful pension grants* and anti-convict labor bills *to catch votes.*"

The question is not whether these words bear the meaning ascribed to them, but whether, read in connection with the words previously quoted, they may not reasonably have attributed to them a defamatory meaning. "Aimed to very doubtful pension grants," and "to catch votes," cannot be said to be idiomatic English or to convey a meaning entirely free from obscurity. But I do not think the phrase devoid of an intelligible meaning. Read in the light of the previous words, it seems to me this language may be construed to mean that some of the aspirants for this office "aimed" or designed to obtain from the United States treasury grants of pensions upon claims not only doubtful, but very doubtful or questionable. In this sense there is an imputation of knowledge of the claims being questionable on the part of the person aiming at their being paid. What meaning is to be attributed to words alleged to be libelous is to be settled by a jury. The court cannot withdraw words from their consideration, if a meaning may reasonably be deduced therefrom which would be defamatory. If, therefore, a jury should find in these words the meaning I have suggested, they would be justified in convicting defendant if that meaning is defamatory.

If these words were used in the sense suggested, they are in my judgment, libelous. For, to constitute a libel, it is not necessary to charge crime or fraud. It is sufficient if the charge tends to subject the person to the ill-will or contempt

of right-thinking readers. A charge that a public representative, for the purpose of obtaining votes, had intentionally pressed for the payment of public money upon claims, the foundation of which was very questionable, could not be read without exciting feelings of distrust or contempt in the mind of every reader, except such as have come to regard public money as rightly used for personal advancement.

Since a conviction might follow if the words I have discussed should be found to have the meaning suggested, it is unnecessary to consider the remainder of the article.

It was further contended that on the face of the circumstances disclosed in the indictment the article complained of was privileged as being only a criticism of the conduct of a public officer during his official term, or as being a discussion of the fitness of Fiedler for the office to which the indictment avers he aspires.

A claim of privilege is usually made by way of defence. But if an indictment for libel shows a publication which, under the circumstances disclosed, was plainly justified, I see no reason why the objection might not be taken advantage of on a motion to quash.

The right of citizens, whether in the public press or elsewhere, to justly criticise the conduct of public officers, and to properly discuss the fitness for office of those who offer themselves as candidates, is of such vast importance that no hindrance to its free exercise ought to be interposed. Whenever it appears that the publication complained of is within this right it ought to be so declared.

But the article complained of in this case makes charges as of the knowledge of its author. These charges the indictment avers to be false. It is well settled that falsehoods are not privileged. If there be a distinction in respect to privilege, between the coining of a falsehood and the mere repetition of a falsehood coined by another, such as seems to have been announced by the majority of the Supreme Court of Pennsylvania, in *Briggs* v. *Garrett*, 4 *East. Rep.* 874, that point does not here arise. If the charges of the article are false they are

*prima facie* unprivileged. To establish privilege it must appear either that they are in fact true or, if not true, that defendant was justified in making them public. This can only appear in the proofs. The allegations, admitted to be true in considering this motion, are otherwise.

The motion to quash must therefore be denied.