AUSTIN v. HYNDMAN.

1. WILLS—CONSTRUCTION—LIFE ESTATE.
   A will devising to a wife, "during her natural life, * * * the possession, exclusive use, control, and management" of specified land, creates in her a life estate.

2. LIBEL—CANDIDATES FOR OFFICE—MALICE.
   Malice is implied from the publication of a libel, though the person libeled was a candidate for a public office.

3. SAME—PUBLICATION OF UNTRUTHS—PRIVILEGE.
   The right publicly to criticise the character of a candidate for office in no way warrants the publishing of untruths concerning him.

4. SAME—ABSENCE OF MALICE—RULE OF DAMAGES.
   The rule permitting plaintiff in an action of libel, where it is shown that defendant acted in good faith, having good cause to believe in the truth of his statements, to recover only the *minimum* of damages, does not mean, necessarily, *nominal*

damages, but, rather, such damages as have actually resulted from the publication, regardless of malice.

Error to Jackson; Peck, J. Submitted January 25, 1899. Decided April 4, 1899.

Case by Addison J. Austin against Duncan Hyndman for libel. From a judgment for plaintiff, defendant brings error. Affirmed.

This is an action of libel, in which the plaintiff recovered a verdict and judgment of $175 for damages to the feelings of the plaintiff. Plaintiff was a supervisor, and a candidate for re-election at the time of the publication of the alleged libel. The publication was as follows:

## "SAD CASE IN NORVELL.

### "AND SOME QUEER PRACTICES BY A SWORN OFFICIAL.

"There lives in the village of Norvell, in this county, an estimable lady, Mrs. Eliza Sweezey, who is 87 years old. She is the widow of William Sweezey, who died in 1887, leaving an estate valued at nearly $35,000. The widow was entitled by law to about $8,000, but was induced to accept about $3,000, and the use, free, during her life, of the house she lives in. Being very frail as well as aged, she has for five or six years been unable to leave her bed, only as she was helped, and has to be helped and turned and fed and waited upon continually night and day, and must have two attendants, for one could not possibly do it. All previous supervisors, knowing the situation, either remitted her tax or made it nominal, as the law permits, and, of course, assessed the house and lot to the estate of William Sweezey, to whom it belongs; and the estate paid the tax, except in 1888, when the executor of said estate, one Stephen W. Holmes, had some money paid to him for the said aged lady, and kept enough to pay the tax on said lot, and would not give it up when demanded, and never has. This executor has never failed to urge every supervisor to assess said lots to the poor, infirm old lady, who has now but very little left of the pittance she accepted from that estate. But now comes a supervisor in 1896, as he was also in 1895, named A. J. Austin, who, as all supervisors are, was sworn to do his duty according to law, which says,

and no question about it, that the supervisor 'shall assess to the owner if known,' etc.   This sworn officer knew the owner, for he assessed the same property to the estate of William Sweezey in 1895.   Yet in 1896 he assessed it to the poor, old, and totally dependent widow, and not at all to the said estate and owner.   It can be proven that the reason he gave for doing this—and we have the affidavits which do prove it—was to please Stephen W. Holmes, said executor.

" A further reason he gave was that it could not do any harm, because the tax on said land could be returned if not paid; and yet they could sell the poor old lady's goods for the tax, if they could find anything.   This same person is up for re-election, and is now trying to hedge by parading a letter, purporting to be from our probate judge, as a decision in this particular case.   We all admire the upright and courteous Judge Hammond, and we have good reason to; so when the judge states, within 10 days back, that he never heard of Mrs. Sweezey, or of the estate of William Sweezey, as that estate has never been before him, nor brought to his notice, being closed before his term, we know it to be true.   He admits that he may have given his opinion upon some question of law in some such general class of cases, as he frequently does as a lawyer, but has rendered no decision in this particular case at all, either as judge or otherwise."

The innuendo alleges that by this publication it was meant that plaintiff,—

"Having been sworn to do his duty as supervisor according to law, and knowing that the law required him to assess the taxes against the estate of William Sweezey, nevertheless willfully, corruptly, and in violation of his oath as such supervisor, and contrary to the statute in such case made and provided, assessed the said taxes against the said Eliza Sweezey."

The article contained, also, the following:

" Ye taxpayers of Norvell, this tax has been returned, and who must make up for this nonresident tax, if it is unpaid ?   What guaranty have ye that the favors in the above line ended with this case of accommodation to the above executor ?   You surely have men among you who are above such practices."

The innuendo as to this last paragraph alleges that plaintiff, as such supervisor,—

"Had been guilty of irregular and illegal conduct in making his assessments as such supervisor, and that he had been paid and accepted bribes therefor."

With his plea of the general issue, the defendant gave notice that he would prove the truth of the allegations in the alleged libel complained of.

*Geo. S. Wilson* and *T. E. Barkworth*, for appellant.

*Blair, Smith & Townsend*, for appellee.

GRANT, C. J. (*after stating the facts*).    1. The court instructed the jury that Mrs. Sweezey was the owner of the life estate, that it was her duty to pay the taxes, that the land was properly assessed to her, and that the publication overstepped the bounds of privilege which the occasion gives, in that it charged the plaintiff with having unlawfully, knowingly, and with an improper or corrupt motive, made the assessment of the property to her, instead of to the estate of William Sweezey.    The duty of the owner of the life estate to pay the taxes is conceded.   The learned counsel for the defendant claim that, under the will, Mrs. Sweezey was not the owner of the life estate. The language of the will is as follows:

"I give and bequeath to my beloved wife, Eliza, if she survives me, $1,500; and I also direct that my said wife, during her natural life, shall have the possession of, and the exclusive use and control and management of, the following real estate [describing it], and all of the household goods, all of which she may receive in lieu of her right of dower, should she so elect."

By this language she was given the exclusive use and control of the property during her life.    It clearly created a life estate, and the instruction was correct.

2. It is next urged that the court erred in its instruction upon the subject of malice.    The instruction complained of is as follows:

"In considering the question of damages, gentlemen, it is necessary, to enable you to make an intelligent disposition of it, to understand what is meant by the term 'malice,' which you have heard used so frequently in the course of the trial. The word 'malice,' when used in relation to the action of libel, means no more than 'willfulness.' A willful injury without just reason is properly called 'malicious.' Malice is said to be express or implied. So far as any explanation of that distinction is necessary for our purposes here, I instruct you that implied malice is the kind of malice which the law presumes actuated the defendant, Dr. Hyndman, in publishing the libel in question; it is what the law assumes influenced him in making the publication; while express malice is such further or additional or actual malevolent design or purpose as may have been entertained by the doctor in making the publication in question. I instruct you, gentlemen, without any further evidence, that the mere fact of the publication itself—those parts of the publication which have not been justified, and which I have instructed you are libelous—should be considered by you as a voluntary act by the doctor, and to have proceeded from a malicious motive. The willful publication by Dr. Hyndman of this libelous statement necessarily involved a design on his part to produce such injury upon the plaintiff as is a necessary consequence of the libel, and the doctor would be liable, without other proof than the publication itself, for all the necessary damages which resulted to the plaintiff from the publication of all those parts of the publication which have not been proven to be true."

The argument against the instruction is that it does not make the distinction between that malice which is actual willfulness and that which in law makes the words actionable; or, as counsel state it, "in other words, the case is tried precisely the same as if no privileged occasion existed." The court had previously instructed the jury that the occasion was privileged, but that the publication, if untrue, was not. We think the distinction sought to be made is rather technical. If the charge made was untrue, it was libelous *per se*, and defendant was liable for all the necessary damages resulting. The rules governing criticisms upon the character of candidates for office have

been frequently discussed by this court, and are familiar to the profession. *Bailey* v. *Kalamazoo Publishing Co.*, 40 Mich. 257; *Belknap* v. *Ball*, 83 Mich. 583 (11 L. R. A. 72, 21 Am. St. Rep. 622); *Dunneback* v. *Tribune Printing Co.*, 108 Mich. 75. One who attacks the character of a candidate for office must be as careful to ascertain the truth of the facts charged as in any other case of libel. The damage resulting from false charges would be more injurious to the candidate for public office than if made against the private individual. The court carefully guarded the rights of the defendant, in instructing the jury what facts they should consider as bearing upon the question of malice. We find no error in this instruction.

3. Counsel for defendant requested the court to instruct the jury:

"(1) Damages in this case are reduced to the minimum if the libel results from an honest mistake, made in an honest endeavor to enlighten the public.

"(2) If the jury find that the defendant acted in good faith and with proper precaution, and had good reason to believe that the statements were true, they should award nominal damages merely, if any."

The second request does not accurately state the law. The word "minimum," used in some of the decisions under similar circumstances, does not mean nominal damages. It means the minimum of damages which the plaintiff has sustained. In such case there could be no damages allowed for malice. Where the charge is untrue, the defendant is liable for the actual damages which result, regardless of malice. *McGuire* v. *Vaughan*, 106 Mich. 280, 287. We think it extremely doubtful if the first request is applicable to the facts in this case; but, however this may be, the court, at the request of defendant, instructed the jury that plaintiff could recover no special damages, and that if they found that defendant was acting upon the advice of the prosecuting attorney as to the law in the case, and that he believed that this advice was correct, they should consider that fact in determining the

extent of the defendant's good faith or malice in making the publication. The small verdict shows that the jury must have taken these things into consideration; for, if any substantial damage was suffered on account of injured feelings, it is difficult to see, under this record, how the verdict could have been less.

Judgment affirmed.

The other Justices concurred.