# JUNE TERM, 1900.

## EIKHOFF v. GILBERT.[1]

124  353
124  384
124  353
s83NW 110

1. LIBEL—CANDIDATES FOR OFFICE — APPEAL TO VOTERS — PRIVILEGE.

   A circular addressed to voters, requesting them to vote against a certain candidate for representative "because in the last legislature he championed measures opposed to the moral interests of the community," without stating the measures supported, is not privileged, for it is a statement of a fact libelous *per se*, and affords no opportunity to judge whether or not the statement is a proper deduction from the facts on which it is based.

2. SAME—TRUTH OF CHARGE—QUESTION FOR JURY.

   In an action of libel for distributing a circular requesting voters to vote against a candidate because he had supported legislation opposed to the moral interests of the community, it is for the jury to say whether the supporting of measures permitting sales of liquors on legal holidays, and on election days after the close of the polls, and authorizing the removal of screens in saloons, was opposed to the moral interests of the community.

3. SAME.

   A circular addressed to voters, charging that a certain person is a self-avowed candidate for liquor dealers, edits a scurrilous newspaper, is the champion of saloon lawlessness and vulgar theaters, and concluding with the words, "for reasons which we consider equally as good we ask you to vote against" another candidate, is libelous *per se* as against such latter candidate.

   GRANT and MOORE, JJ., dissenting.

Error to Wayne; Waite, J. Submitted February 6, 1900. Decided June 5, 1900.

Case by Henry J. Eikhoff against Edward T. Gilbert and others for libel. From a judgment for defendants on verdict directed by the court, plaintiff brings error. Reversed.

---

[1] Rehearing denied December 11, 1900.

*Edward S. Grece* (*William B. Jackson*, of counsel), for appellant.

*Wells, Angell, Boynton & McMillan,* for appellees.

HOOKER, J. The defendants are members of an organization called the "Good Government League," in the city of Detroit, which professes to have for its object the election of worthy men to office, and the promotion of good order and honest administration of city affairs. The plaintiff, having attended one session of the legislature in the capacity of representative, was a candidate for re-election. This action is for libel, alleged to have consisted of three publications over the names of the defendants. One, for convenience called the "White Circular," was addressed to the voters, and contained in parallel columns the names of several candidates whom the electors were advised to vote for or against. The portion applicable to the plaintiff was as follows:

"VOTE

| "FOR | AGAINST |
|---|---|
| Harry C. Barter for representative, because he represents all that is good in his opponent, and does not represent the objectionable. He is the champion of labor and arbitration. | Henry Eikhoff for representative, because in the last legislature he championed measures opposed to the moral interests of the community." |

Another, called the "Pink Circular," contained the following:

"READ AND REFLECT BEFORE YOU VOTE.

"The executive council of the Good Government League has carefully examined the record of each candidate for office. Where opposing candidates are equally bad or equally good, we make no recommendations. The following suggestions are made in the hope that they may aid you in the discharge of your duty as a citizen, and that righteousness may prevail in public as well as in private affairs:

"Lou J. Burch is candidate on the Republican ticket for representative. All friends of morality and decency are asked to vote against him for the following reasons: Lou J. Burch is secretary of the Michigan Liquor Dealers' League. He is editor of the official organ of that league. He is a self-avowed candidate for the liquor dealers, and desires to go to the legislature to work in the interest of the saloon. Lou J. Burch is editor and publisher of a scurrilous sheet, dated Saturday, but always issued Sunday morning. In his paper the ministry is ridiculed, women are maligned, and workers for the cause of righteousness are defamed. Lou J. Burch is the champion of saloon lawlessness and of vulgar theaters. Lou J. Burch has offered insult to every colored man, woman, and child in Detroit. In witness of these facts, read the following statements from his own sheet:

" 'The liquor interests of the city are likely to have something to say in the convention. Lou J. Burch, editor of ———, is their candidate.' October 29, 1898.

" 'Here and there could be seen the burly forms of chicken-fed preachers, arrayed in long, dark frock coats, with hair pompadour, and smile urbane as the harvest moon, moving about among the female portion of the flock, thinking what a snap they had. It was a veritable Eden for them, and it was full of ripe, luscious apples, and no snakes. A preacher is never so near his heaven as when in charge of a menless audience or convention.' January 22, 1898.

"Speaking editorially of one of Woodward avenue's most prominent and popular ministers, the sheet says:

" '* * * He is either crazy, a fool, or both; and that, at best, he is a weak, narrow-minded bigot, without religion or sense.' May 7, 1898.

"Referring to deaconesses and other Christian workers, Burch's paper says:

" 'The front row of chairs was occupied by as interesting a bunch of short-haired, long-nosed women, of doubtful age, as one would meet in a long search.' October 1, 1898.

"Referring to prominent pastors and church workers who were at police court recently, Burch's paper says they were 'as fine a looking lot of spies and sneaks as ever put powder to a safe.' October 1, 1898.

" 'And still these awful good and pious old ladies can never see

anything wrong with hugging and kissing bees and grab-bag bunco games as they are carried on at the regulation church socials.' October 22, 1898.

"In commenting upon the discharge in the recorder's court of a saloonist, Burch's paper says:

" 'The outcome of all these cases should be the same as this first one, and probably will be. Mathews was defended by Navin & Sheehan.' October 15, 1898.

"Burch's paper spoke as follows concerning the effort to close the Capitol-Square Theater:

" '* * * Agitating against the Capitol-Square Theater with the intention of closing it, but without success, for the simple reason that there is no excuse for such an outrageous procedure.' April 2, 1898.

"After the evidence upon which the theater was closed was in, Burch's paper said:

" 'As the investigation now stands, there can be but one result, —the complete vindication of Dr. Campbell.' April 9, 1898.

" 'Republican politicians about town are wondering which side of the fence Charlie Joslyn will be found upon in the Pingree and anti fight this year. Pingree bought Charlie with a $5,000 per year job two years ago, but there is a rumor that the foxy Charlie is looking for a raise this year.' April 16, 1898.

" 'SHOULD STAY AWAY.

" 'Negroes must Realize that There is a Line.

" 'The question of the color line has arisen in Detroit once more. A negro claims that he was discriminated against at Stock's Riverside Park. This statement is denied, however. He had no business there. Negroes must realize the fact that white people will associate with them more or less in business, but will certainly refuse to be on equal terms with them socially. Knowing the objection there is for their company, why does the negro force it ? No gentleman would. White men would be forcibly ejected from any place where they made themselves half as obnoxious as do most colored people. It has since transpired that the negro, anxious for a case, made no complaint to Mr. Stock, but straightway rushed into court. Mr. Stock is a very fair-minded gentleman, and is willing, and always used Detroit citizens liberally, and there is no doubt they will support him against the arrogance of Detroit's colored population.' May 28, 1898.

" 'The ladies of the W. C. T. U. have been having sixteen fits each all the week over a showbill in which a man is depicted in the

act of choking a woman. If the man in question had a grip on a half dozen or more men-women who have been making fools of themselves here in Detroit for the past year, the picture would be better appreciated by a large majority of the people.' October 29, 1898.

"Burch probably desires the repeal of the minor law. Judge from the following:

" 'TO FATHERS AND MOTHERS:

" 'Fathers and mothers of Michigan, has it ever occurred to you that the doors of the saloon are barred against your minor sons and daughters, while they can enter a drug-store with seeming propriety, and sip intoxicating drinks issued from a soda fountain? Which of the two institutions is the more likely to start innocent youth on the downward path? Do you think it fair and just to continually persecute the licensed saloonkeeper, who executes a large bond guaranteeing the proper conduct of his place, and wink at the unlicensed whisky-selling druggist? Pause and consider.' June 4, 1898.

"For several weeks Burch's paper has carried the following in display type:

" 'Below are the names of the 39 men who not only voted against this particular bill, but used their influence against the liquor interests during the entire session. Don't wait for the election this fall, but be on hand at the caucuses and the conventions, and see to it that these 39 men get just what they gave you,—the dump.' September 24, 1898.

"By your vote do you desire to ask the State to bear the expenses and pay the expenses and pay the salary of the saloonkeepers' lobbyist? That your vote may be effective, we ask all who may refuse to vote for Burch to concentrate their votes upon Alex. W. Blain.

"For reasons which we consider equally as good, we ask you to vote against Henry Eikhoff, candidate for representative, and for Harry C. Barter."

There was a third, but it is unimportant. The declaration alleged that the effect and meaning of the pink circular was to charge and impute by inference and intent, upon the plaintiff, all of the wrongful, indecent, immoral, wicked, and scandalous acts charged against said Burch. The court excluded the pink circular as not libelous, and directed a verdict for the defendants upon the other counts.

The question before us is whether the case should have been submitted to the jury upon one or both counts. The first charge is, in substance, that the plaintiff, in his official capacity of representative, championed measures opposed to the moral interests of the community. The undisputed . testimony shows that as representative he introduced, and, to some extent, at least, approved and supported, measures calculated to change the liquor laws of the State by permitting sales on legal holidays, and election days after the close of the polls, and by repealing the act prohibiting screens in saloons. The court charged the jury that:

"The conclusion of the article, and the views as expressed by the defendants in that article, must of necessity, under the circumstances of the case, be termed a deduction from his record in the case. It is a question upon which men may differ. It probably will be very difficult to determine with any unanimity as to whether such measures were against the moral interests of the community. It is a question of judgment, in other words, based, in my opinion, upon his record in the legislature. Whether it is for the moral interests of the community is an open question. In my judgment, it was such a criticism upon his acts as might legitimately be made by any voter to the voting population of the State or of the county from which he asked to receive the suffrage of the people. If it were true that those acts were against the moral interests of the community, he would have no case here. If they were false, then the question of qualified privilege, as we say in law, would arise. There are certain things which persons may say under certain circumstances which are called privileged in the law,—qualifiedly privileged,—and it depends upon the occasion as to whether an utterance or publication is privileged. I charge you that in this case this was a privileged occasion. If they had the right to criticise the acts of this man, being a man running for public office, and one who asked to receive the trust and confidence of the people to perform the duties of that public office, they had a right to criticise him; and, though it was false, it would not be actionable, unless it was published with malice or in bad faith. I do not think in this case there is any evidence of malice outside of the publication itself,—any positive proof,—which,

in my judgment, would be required to be shown on the part of the plaintiff. Hence, if the publication was false, if it was such a publication as would require justification to be shown,—which would be true if the occasion was not privileged,—it being privileged and false, if they acted in good faith, and without malice, the plaintiff would have no right to recover. I don't think there is any evidence of malice, as I said, or ill-will, on the part of the defendants in this case; and on the whole case—on the evidence as it has appeared in this case—I charge ,you to find for the defendants. The verdict is,. ' Not guilty,' I think. The clerk will take the verdict."

The language of the white circular, unexplained, unequivocally charged the plaintiff with having championed legislation opposed to the moral interests of the community. This charge is an attack upon his moral character, and would be likely to bring him into public contempt and disgrace. It is, therefore, libelous *per se.* The defense made was: *First*, that the statement was true; and, *second*, that, if it cannot be said to be true, the proven acts were subject to criticism, and defendants had the right to express their opinion as to their effect,—in other words, that the language was privileged.

The defendants had a right to discuss the fitness of the plaintiff for the office to which he aspired, and might lawfully communicate to the electors any facts within their knowledge concerning his character or conduct, and express their opinions upon them, and their inferences deduced from them, so long as they stated as facts only the truth, and as opinions and inferences therefrom only honest belief. The fault here, if there be one, is that opinions and inferences were not stated as such, but as facts. The defendants sought to justify the statement made, viz., that the plaintiff championed measures opposed to the moral interests of the community, by proving that he supported the two measures stated. To the minds of some, that would be sufficient to establish the truth of the charge. Others would think otherwise. It is manifest, therefore, that we cannot say, as a legal proposition, that

the undisputed testimony establishes the truth of the broad charge. Evidently the learned circuit judge took this view. It is evident that the acts proved were sufficient to induce in the minds of some the opinion that plaintiff had supported measures opposed to the moral interests of the community. The judge therefore instructed the jury that such persons were privileged to say so, and directed a verdict for defendants. But, admitting that they were privileged to express their opinions concerning certain acts, was this what was done? Did they not go further, and do more? They did not state what measures were supported, and their opinions of that particular conduct, but said generally and unqualifiedly, as a fact, that the plaintiff had arrayed himself against the moral interests of the community, which, if true, should discredit him with any voter who should believe the statement. It appealed alike to all classes,—those who should look upon the legislation proven as not opposed to the moral interests of the community as well as those holding contrary views; and it afforded no one an opportunity to judge whether the statement was a proper deduction from the facts upon which it was based or not. · If one states that a candidate is a thief, without qualification, he communicates a fact pertaining to his fitness; but it is a slander if untrue, whether it was made in good faith or not, although, had he stated the exact facts, and expressed the opinion that they amounted to stealing, though they did not technically constitute the offense of larceny, the communication might be privileged.

The difficulty in this case is that the defendants have been permitted to limit their statement by proof of their intended meaning, while the writing itself contained no hint of limitation. The case of *Ellis* v. *Whitehead*, 95 Mich. 115 (54 N. W. 757), is in point. It was there said:

"The fourth request should not have been given. It makes the slander depend entirely upon the intention of the defendant, and, in effect, says that vituperation is not slander when provoked, though it transcend the bounds of

truth and propriety. It is going sufficiently far to say that a person may without liability call another a thief under circumstances which show he does not mean it. To hold that he could do so in the absence of qualifying circumstances, and shelter himself behind a provocation, real or imaginary, adequate or inadequate, would carry the rule much too far. In actions for defamation it is immaterial what meaning the speaker intended to convey. He may have spoken without any intention of injuring another's reputation; but, if he has in fact done so, he must compensate the party. He may have meant one thing and said another. If so, he is answerable for so inadequately expressing his meaning. * * * Slander, like other wrongs, is actionable because injurious; and, while intention may have much to do with the question of damages, it is not necessarily involved in the question of guilt."

We are of the opinion that the court erred in saying that the words were privileged. Not being privileged, it should have been left to the jury to say whether the evidence showed that plaintiff's support of these measures was opposed to the moral interests of the community as a matter of fact; in other words, to determine the truth of the charge.

It is hardly necessary to cite authorities in support of the doctrine that a candidate for office has a right of action for aspersions upon his character, and cannot be subjected to unwarranted and untruthful charges. In New York no distinction seems to be made between a public man and a private citizen. *Lewis* v. *Few*, 5 Johns. 1; *Root* v. *King*, 7 Cow. 613, 4 Wend. 113 (21 Am. Dec. 102); *Hamilton* v. *Eno*, 81 N. Y. 116. A leading case will be found in *Com.* v. *Clap*, 4 Mass. 163 (3 Am. Dec. 212). See, also, *Curtis* v. *Mussey*, 6 Gray, 261; *State* v. *Schmitt*, 49 N. J. Law, 579 (9 Atl. 774); *Hunt* v. *Bennett*, 19 N. Y. 173; *Pierce* v. *Ellis*, 6 Ir. C. L. 55; *Simpson* v. *Downs*, 16 Law T. R. (N. S.) 391; *Duncombe* v. *Daniell*, 8 Car. & P. 222. In this last case Lord Denman said: "However large the privilege of electors may be, it is extravagant to suppose that it can justify the

publication to all the world of facts injurious to a person who happens to stand in the situation of a candidate." *Bailey* v. *Publishing Co.*, 40 Mich. 254; *Bronson* v. *Bruce*, 59 Mich. 467 (26 N. W. 671); *Wheaton* v. *Beecher*, 66 Mich. 310 (33 N. W. 503); *Belknap* v. *Ball*, 83 Mich. 587 (47 N. W. 674, 11 L. R. A. 72, 21 Am. St. Rep. 622); *Wolff* v. *Smith*, 112 Mich. 360 (70 N. W. 1010); *Austin* v. *Hyndman*, 119 Mich. 615 (78 N. W. 663); *Clifton* v. *Lange*, 108 Iowa, 472 (79 N. W. 276); *Field* v. *Magee*, 122 Mich. 556 (81 N. W. 354).

The court excluded all proof in relation to the "Pink Circular," upon the ground that it was not libelous. After charging that Burch is a self-avowed candidate for the liquor dealers, and desires to go to the legislature to work in the interest of saloons, that he edits a scurrilous newspaper, that he is the champion of saloon lawlessness and vulgar theaters, and quoting at length from his writings, as already shown, the pink circular concludes as follows, viz.: "For reasons which we consider equally as good, we ask you to vote against Henry Eikhoff." The count alleges under innuendoes that the meaning of this circular was that the plaintiff was an indecent and immoral man, and equally as unworthy of support as 'Burch. We are of the opinion that this comparison with Burch cannot mean less than that the plaintiff was a man as unworthy of support as Burch, for reasons not given, except as they may be implied by the charges made against Burch. Some of the charges against Burch were libelous *per se; e. g.*, that he is the champion of saloon lawlessness and vulgar theaters. Thus the pink circular itself furnishes implications throwing light upon the meaning of the words used about plaintiff, and justifying the claim made, viz., that he was represented to be a man of bad morals, and unworthy of support for that reason. We think this also was libelous *per se*, and should have been admitted, leaving the defendants to prove the truth of the charge.

The judgment is reversed, and a new trial ordered.

MONTGOMERY, C. J., and LONG, J., concurred with HOOKER, J.

GRANT, J. (*dissenting*). I cannot concur in the opinion of my Brother HOOKER. The right of citizens to criticise the character, acts, and record of a candidate for public office is involved. The principles of law governing such cases are not in dispute. They have often been stated in the decisions of this court, and the distinctions between justifiable criticism and charges of criminal and degrading conduct pointed out. *Belknap* v. *Ball*, 83 Mich. 583 (47 N. W. 674, 11 L. R. A. 72, 21 Am. St. Rep. 622); *Dunneback* v. *Printing Co.*, 108 Mich. 75 (65 N. W. 583); *Owen* v. *Dewey*, 107 Mich. 67 (65 N. W. 8); *Howard* v. *Dickie*, 120 Mich. 238 (79 N. W. 191). The other cases will be found cited in the above, and cover the entire field of discussion upon the question now before us.

1. I think the court correctly ruled out the "Pink Circular." This circular makes grave charges against Burch, and urges the electors to vote for his opponent, Mr. Blain. It then says: "For reasons which we consider equally as good, we ask you to vote against Henry Eikhoff, candidate for representative, and for Harry C. Barter." If the circular had read "for reasons which we consider good," it would not be contended that the words would be libelous. Citizens certainly have the right to declare that they have good reasons for opposing a candidate, though they do not state them, without subjecting themselves to an action of libel or slander. It follows that this article is not libelous *per se*, and cannot be made libelous by innuendoes, unless it can naturally be construed into charging plaintiff with the same or similar acts as charged upon Burch. It does not charge plaintiff with the offenses charged upon Burch. They do not imply that plaintiff is guilty of the same or similar offenses. On the contrary, the plain inference is that the reasons are not the same, but, in the opinion of the writers, "equally as good." The language speaks for itself.

There is no occasion for an innuendo to explain it. When we read the other circular, we find that those reasons are his championship of certain measures in the legislature of which he was a member. When we read the evidence, we find it conclusively establishes that these measures provided for the removal of certain restrictions in the present liquor law of the State which have been upon the statute book for about 20 years.

2. The "White Circular" reads: "Take this to your voting booth, and, whatever your party preferences may be, remember that you should vote against Henry Eikhoff for representative, because in the last legislature he championed measures opposed to the moral interests of the community." This statement refers to the public record of plaintiff as a member of the legislature. It does not charge him with crime, or criminal or scandalous conduct. It means no more than this: That, in the opinion of the writers, measures were introduced into the legislature which were opposed to the moral interests of the community. These measures were designed to accomplish the removal of some restrictions now placed upon the liquor traffic by providing for the repeal of the provisions of the law for the removal of screens and blinds from saloon fronts, and for closing on certain holidays, and during certain hours on election days. It may be true, as the circuit judge said in directing a verdict: "It probably will be very difficult to determine with any unanimity as to whether such measures were against the moral interests of the community." But the defendants certainly had the right to condemn them as opposed to the moral interests of the community, and to urge electors to vote against candidates who would support them. The evils of the liquor traffic are matters of common knowledge. How it is regarded by the courts will appear in *Kurtz* v. *People*, 33 Mich. 279, in an opinion written by Justice CAMPBELL, and concurred in by the entire court; and in the case of *Crowley* v. *Christensen*, 137 U. S. 86 (11 Sup. Ct. 13), in an opinion written by Mr. Justice FIELD, and concurred

in by the entire court.   In the former opinion the court
uses the following language:

"The continuance of lounging and drinking into the
late hours of the night is equally known as peculiarly dan-
gerous.   Men or boys can escape observation more readily
by night than by day.   When they have once become
engaged in the pleasures and temptations of such resorts,
it is but too sadly manifest to all who do not shut their
eyes to what is going on around them that, after drinking
has once begun by those who are in danger of excess (if
there are any that are not), it is apt to be kept up much
longer than may have been thought of or intended.
'Midnight revels' would never have become a popular
phrase unless they had been a well-known reality.   Unless
the annals of crime are strangely distorted, the amount of
mischief due to the indulgence of late drinking is much
beyond its proportion in any other part of the day."

In the latter the following language is used:

"It is urged that, as the liquors are used as a beverage,
and the injury following them, if taken in excess, is vol-
untarily inflicted, and is confined to the party offending,
their sales should be without restrictions; the contention
being that what a man shall drink, equally with what he
shall eat, is not properly matter for legislation.   There is
in this position an assumption of a fact which does not
exist,—that, when the liquors are taken in excess, the in-
juries are confined to the party offending.   The injury, it
is true, first falls upon him in his health, which the habit
undermines; in his morals, which it weakens; and in the
self-abasement which it creates.   But, as it leads to neg-
lect of business, and waste of property, and general de-
moralization, it affects those who are immediately con-
nected with and dependent upon him.   By the general
concurrence of opinion of every civilized and Christian
community, there are few sources of crime and misery
to society equal to the dramshop, where intoxicating
liquors, in small quantities, to be drunk at the time, are
sold indiscriminately to all parties applying.   The statis-
tics of every State show a greater amount of crime and
misery attributable to the use of ardent spirits obtained at
these retail liquor saloons than to any other source.   The
sale of such liquors in this way has therefore been, at all
times, by the courts of every State, considered as the
proper subject of legislative regulation.   Not only may a

license be exacted from the keeper of the saloon before a glass of his liquors can be thus disposed of, but restrictions may be imposed as to the class of persons to whom they may be sold, and the hours of the day and the days of the week on which the saloons may be opened. Their sale in that form may be absolutely prohibited. It is a question of public expediency and public morality, and not of federal law. The police power of the State is fully competent to regulate the business,—to mitigate its evils, or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail; it is not a privilege of a citizen of the State or of a citizen of the United States. As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils."

If the eminent men and jurists then composing those courts may thus characterize the liquor traffic, declare that its evils are matters of common knowledge, and recognize the propriety and necessity of sustaining stringent regulations in the conduct of the business, it certainly is not very far from the truth to say that measures designed to open the saloon at night or on holidays, when men are idle, are opposed to the moral interests of the community. There are those whose lives are otherwise above suspicion, who advocate the wide-open saloon, and who even advocate the licensing of houses of prostitution. The prevailing sentiment, however, among respectable people is against them. If to say of a member of the legislature who supports such measures that he is supporting measures opposed to the moral interests of the community is an attack upon his moral character, it is an attack for which the law provides no remedy; otherwise, citizens and newspapers would be prevented from criticising any act of the legislature, or any proposed measure, as injurious to the moral interests of the community. I submit, however, that such criticisms are not attacks upon a man's moral character. The statement that a man supports measures which may generally be conceded to be against the moral interests of the community is not charg-

ing him with immorality.  But he assumes the risk of all criticism upon his acts, however severe or unjust it may be.  One of the defendants (Mr. Service) testified:

"My opinion in regard to the opening of the saloons on holidays is that the tendency would be to an increase of drunkenness, and consequent immorality.  In regard to the screen law, I think the taking down of the screens keeps out of the saloon very many young men who would be led by shame not to expose themselves publicly."

The people of this State, through their legislature, have for 20 years held that it was for the moral interests of the people to restrict the liquor traffic.  The law could not be sustained on any other basis.  When, therefore, any member of the legislature introduces or champions a bill for the removal of any of these restrictions, citizens have a right to condemn his conduct as antagonistic to the moral interests of the community, and to urge that as a reason for preventing his election.  Such right is unquestioned.  This is all there is to the "White Circular." Had defendants specified the measures referred to, it is not claimed that the article would be libelous.  If one publishes of a candidate that he is or has been a gambler, may he not allege and show in his defense specific acts of gambling? or that he has been convicted of crime, may he not in defense allege and prove a record of conviction? or that he is immoral, may he not allege and show specific acts of immorality?  I find no authority which holds so technical a rule as to require one to state the facts upon which he makes the charge, even in communications not privileged.  In *Samuel* v. *Bond*, Litt. Sel. Cas. 158, the slander was, "Bond is a thief, and has stolen corn;" plea, "The plaintiff is a thief, and this defendant is ready to verify."  Held insufficient; he should have specified the acts upon which he based the charge that he was a thief; citing *Craft* v. *Boite*, 1 Saund. 244, note 6; 2 Chit. Pl. 503.  See, also, *Wright* v. *Lindsay*, 20 Ala. 428, where the slander consisted in charging plaintiff with stealing whisky.  *Vaughan* v. *Havens*, 8 Johns. 109; Newell,

Slander & L. (2d Ed.) pp. 651–664; *Smith* v. *Richardson*, Willes, 20. "If the charge is made in general terms, the particular facts relied upon as constituting the charge must be set forth specifically." 13 Enc. Pl. & Prac. 82, 83; *Sunman* v. *Brewin*, 52 Ind. 140.

The measures and his support of them were matters of public record upon the journals of the legislature. When one becomes a candidate for public office, his previous official record is before the electors for criticism. There was no misrepresentation of any act of the plaintiff. The article necessarily referred readers to his record. It made no charge outside of that. Parties had the right to criticise his public conduct generally or specially. No case is cited holding that it is libelous to say that one supported measures opposed to the moral interests of the community. Would it have been libelous to publish of a member of Congress who supported the fugitive slave law and other proslavery measures that he supported measures. in Congress opposed to the interests of humanity and the moral interests of the country? So long as the criticism is based solely upon his official record, the article is privileged. When the facts are truthfully stated or referred to, criticisms thereof and inferences drawn therefrom are not libelous. Parties upon the hustings, in newspapers, or private speech may freely criticise a candidate's official acts, either generally or specially, without subjecting themselves to an action of libel or slander. The occasion was privileged. The publication was also within the rule of qualified privilege. In these cases the *onus probandi* is upon the plaintiff to show both falsehood and malice. *Edwards* v. *Chandler*, 14 Mich. 475 (90 Am. Dec. 249); *Howard* v. *Dickie*, 120 Mich. 238 (79 N. W. 191); *State* v. *Balch*, 31 Kan. 465 (2 Pac. 609); *Marks* v. *Baker*, 28 Minn. 162 (9 N. W. 678); *Neeb* v. *Hope*, 111 Pa. St. 145 (2 Atl. 568); *Chaffin* v. *Lynch*, 84 Va. 884 (6 S. E. 474); *Briggs* v. *Garrett*, 111 Pa. St. 404, 414 (2 Atl. 513, 56 Am. Rep. 274); *Clark* v. *Molyneux*, 3 Q. B. Div. 237. Baron Parke said:

"The occasion prevents the inference of malice which the law draws from unauthorized communications, and affords a qualified defense, depending upon the absence of actual malice. If fairly warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society; and the law has not restricted the right to make them within any narrow limits." *Toogood* v. *Spyring*, 1 Cromp., M. & R. 181.

Plaintiff admits he supported these measures. There is no distortion or misstatement of facts. How, then, is he libeled? There is no intrinsic evidence of malice upon the face of the publication. There is no extrinsic evidence. On the contrary, the record shows that the defendants acted in the utmost good faith, and without any malice towards the plaintiff. Only one of the defendants had ever met him. They are honest, reputable, and influential citizens of Detroit. Their purpose, namely, the enlightenment of electors as to the character of a candidate for public office, was laudable. It is certainly the right, if not the duty, of good citizens to enlighten not only themselves, but their neighbors, as to the qualifications of candidates. In doing this, freedom of speech cannot be confined within narrow limits. I find nothing in this record to show that these defendants exceeded the privilege which must be accorded to every citizen of the State, if honest and reputable men are to be elected to office.

Briefly stated, the plaintiff's contention is this: If defendants had set forth in their circular these measures which plaintiff had introduced and championed, and had denounced them as against the moral interests of the community, and denounced him for supporting them, there would have been no libel. But in an action of libel based upon the general statement that he had supported such measures, without specifying them, it is no defense to set out in the plea what those measures were, and prove them, and that he supported them, without submitting to the jury the question whether the measures were in

fact opposed to the moral interests of the community. So, in one case the opinion of the defendants prevails as to the character of the measures, while in the other the opinion of the jury prevails. I find no authority for such a rule.

I think the judgment should be affirmed.

MOORE, J., concurred with GRANT, J.