## A. S. ABELL COMPANY *v.* KIRBY

[No. 42, September Term, 1961.]

*Decided December 22, 1961.*

*Motion for rehearing filed January 19, 1962, denied and opinion modified January 30, 1962.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY, and MARBURY, JJ.

*Kenneth C. Proctor* and *Robert R. Bair,* with whom were

*J. Crossan Cooper, Jr.,* and *Venable, Baetjer & Howard,* on the brief, for appellant.

*Alan H. Murrell* and *W. Giles Parker* for appellee.

HAMMOND, J., delivered the opinion of the Court.

The A. S. Abell Company, publisher of The Sunpapers, appealed from the substantial judgment that followed the jury's verdict against it and in favor of the appellee, Kirby, in his suit for defamation. The defense was that the editorial complained of, in which Kirby was called "infamous," was fair comment on a matter of public interest. The principal reliance on appeal is that the trial judge erred when he made the issue of fair comment *vel non* turn on whether the facts stated or referred to in the editorial formed a sound basis for the charge that Kirby was infamous. It is claimed he erred in not permitting the jury to consider in bar of the action (but only as bearing on the presence or absence of express malice) any testimony as to other facts concerning Kirby's conduct on and activities in connection with the Rackets Squad of the Police Department, which the publisher claimed were so well known in the community as to support the use of the term "infamous" as fair comment.

After it had held a hearing at which unsworn witnesses not subject to cross-examination, including Kirby, testified, the Baltimore City Delegation in the Legislature formally charged to the Governor that Police Commissioner Hepbron had condoned illegal wire taps, had been friendly with underworld leaders, had used personnel of the Police Department outside the City, and had brought unauthorized persons into the wire tap room of the Department; and that these actions amounted to incompetence and misconduct within the meaning of Art. II, Sec. 15, of the Constitution of Maryland, which empowers the Governor to remove a civil officer for such causes. After a hearing at which there were some twenty-five witnesses (including Kirby, who testified he had seen Hepbron leaving a Baltimore hotel with an underworld figure and two girls from "the Block"), the Governor found that "the most that the

evidence discloses * * * is that the Police Commissioner has committed certain indiscretions and at times has exercised poor judgment. Contact, however slight, with persons having past criminal records * * * which is not in the line of duty is neither desirable nor discreet. The record discloses that Mr. Hepbron had such contact after he became Police Commissioner." He concluded, "I am not unmindful of the fact that the ability of Mr. Hepbron to serve in the delicate and sensitive position of Police Commissioner of Baltimore City may have been impaired. * * * Regrettable as this may be, it would not justify me in exercising the extraordinary powers * * * to remove the Police Commissioner for incompetency or misconduct."

On June 17, 1959, the day after the Governor's decision was announced, his opinion, news stories about it, and the editorial complained of appeared in The Morning Sun.

The editorial was headed "Not Proved." It said the driving force in the effort to "get" Hepbron was a legislator fronting for a political leader of Baltimore; that the manager of the "shocking kangaroo court" staged by the City Delegation in the Spring, "at which unsworn witnesses threw everything they had at Mr. Hepbron and the victim was not even allowed to cross-question witnesses or introduce witnesses of his own," was another member of the political leader's "crowd in the Legislature"; that the motives of the "crowd" in trying to "get" the Police Commissioner and so to create a vacancy in the office "may be left to the imagination." There followed the paragraph alleged to have been libelous, as follows:

"Every important witness against the Police Commissioner, moreover, was a man with a motive. We name especially the infamous Kirby, former Inspector Forrester, and former Chief Inspector Ford whose retirement was requested and granted some time ago with dazzling haste."

To the declaration of Kirby, alleging that the editorial has libeled him, the publisher plead the general issue. Thus justification by way of truth could not be shown, Maryland Rule 342 c 2 (h), although the defense of fair comment could be.

At the trial publication was admitted and it was conceded that the term "infamous" is libelous *per se* and gives rise to a presumption of malice unless privileged.

Offered in evidence were standard definitions of the word "infamous," including these: "having a reputation of the worst kind [,] held in abhorrence [,] base, detestable [,] nefarious-odious"; and, "One of the strongest adjectives of detestations of persons in the English language. * * * Deprived of all or certain of the rights of a citizen, in consequence of conviction of certain crimes." The writer of the editorial testified he intended by the use of the word to convey the meaning of "the common usage—bad reputation, disgraceful."

It is recognized that a newspaper like any member of the community may, without liability, honestly express a fair and reasonable opinion or comment on matters of legitimate public interest. The reason given is that such discussion is in the furtherance of an interest of social importance, and therefore it is held entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. 1 Harper & James, *The Law of Torts,* Sec. 5.25; Prosser, *Torts* (2d ed.), p. 607.

The Courts and the writers have not agreed as to whether fair comment is a qualified privilege (those who say it is rely largely on the fact that actual malice, as in the case of concededly qualified privileges, destroys the otherwise existing immunity) or whether such a publication is merely outside the scope of actionable defamation. In practical effect and result, whichever view is taken would seem to make no difference (except perhaps on the burden of proof), since there is immunity on either basis.[1]

---

1. Prosser, *Torts,* (2d ed.), p. 619, says: "There has been a great deal of quite pointless discussion and disagreement among courts and writers as to whether such publication is to be regarded as defamatory but privileged in the public interest, or merely as outside of the scope of actionable defamation."

1 Harper & James, *The Law of Torts,* p. 457, says: "There is some difference of opinion as to the rationale of the rule, one view regarding fair comment as a genuine privilege, the other putting fair comment entirely outside the ordinary principles of the range of libel by regarding writings which come within the ambit of the fair comment idea as not libelous at all. In so far as the difference

Whether a publication claimed to come within the protection of fair comment is actionable often turns on whether or not it contains misstatements of fact as distinguished from expression of opinion. The majority of the States (perhaps three-fourths) hold that the immune instances of public discussion are those limited to opinion, comment, and criticism, and do not embrace those in which there is any false assertion of dafamatory fact. See, for example, *Washington Times Co. v. Bonner,* 86 F. 2d 836 (D. C. Cir.); *Post Pub. Co. v. Hallam,* 59 F. 530 (C. C. A. 6th) (*per* Taft, J.); *Hubbard v. Allyn,* 86 N. E. 356 (Mass.); *Burt v. Advertiser Newspaper Co.,* 28 N. E. 1 (Mass.) (*per* Holmes, J.); *Eikhoff v. Gilbert,* 83 N. W. 110 (Mich.); 1 *Harper & James, op. cit. supra,* p. 458-9; *Prosser, op. cit. supra,* p. 621-2; Annotations, 150 A.L.R. 358, 110 A.L.R. 412, 1918 E L. R. A. 21. The American Law Institute reversed the view taken in its tentative draft and adopted the majority view. See 3 *Restatement, Torts,* 598, comment a, discussed in Note, *Fair Comment,* 62 Harv. L. Rev. 1207, 1212. The minority view, that even false statements of fact are privileged, at least as to public officers and candidates, if they are made for the public benefit with an honest belief in their truth (because the public interest demands that those who are in a position to furnish information about public servants should not be deterred by fear of suit), has long been favored by many commentators but there has been no rush by the Courts to adopt it. See Noel, *Defamation of Public Officers,* 49 Col. L. Rev. 875, 891-900; Comment, *Developments in the Law — Defamation,* 69 Harv. L. Rev. 875, 928.

Maryland has consistently followed the majority rule—that defamatory misstatement of fact cannot be defended successfully as fair comment. *Snyder v. Fulton,* 34 Md. 128, 137-8; *McBee v. Fulton,* 47 Md. 403, 416; *Brush-Moore Newsp. v. Pollitt,* 220 Md. 132, 138. *Cf. Negley v. Farrow,* 60 Md. 158;

---

of view has any practical significance at all, the former seems the proper one since proof of actual malice will defeat the immunity which is thus a defeasible or 'qualified' one."

See also Gately, *Libel and Slander* (4th ed.), pp. 336-8; Thayer, *Legal Control of the Press* (3d ed.), pp. 397-9.

*Coffin v. Brown,* 94 Md. 190. The distinction between "fact" and "opinion," although theoretically and logically hard to draw, is usually reasonably determinable as a practical matter: Would an ordinary person, reading the matter complained of, be likely to understand it as an expression of the writer's opinion or as a declaration of an existing fact? An opinion may be so stated as to raise directly the inference of a factual basis, and the defense of fair comment usually has been held not to cover an opinion so stated.

The greater number of Courts have held that the imputation of a corrupt or dishonorable motive in connection with established facts is itself to be classified as a statement of fact and as such not to be within the defense of fair comment. *Prosser, op. cit., supra,* p. 622; Thayer, *Legal Control of the Press* (3d ed.), Sec. 66.

In *Negley v. Farrow,* 60 Md. 158, 175, the newspaper charged a State senator with being under the influence of a corrupt ring and alleged that a valuable contract was given him by the head of the ring because he was a senator and "had a vote to give in the Senate." The defense was fair comment. The Court said:

> "No one denies the right of the defendants to discuss and criticise boldly and fearlessly the official conduct of the plaintiff. It is a right which, in every free country belongs to the citizen, and the exercise of it, within lawful and proper limits, affords some protection at least against official abuse and corruption. But there is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man, and the imputation of corrupt motives, by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the personal character of a public man, and to ascribe to him base and corrupt motives, he must do so at his peril; and must either prove the truth of what he says, or answer in damages to the party injured.
>
> The fact that one is the proprietor of a newspaper, entitles him to no privilege in this respect, not pos-

sessed by the community in general. The law recognizes no duty, imposed on him, arising from his relations to the public, to defame and libel the character of any one, and if he does, it is no answer to say, he did so in good faith, and without malice, honestly believing it to be true. * * *" (*Id.* at 176-7.)

The rules laid down in *Negley* were followed in *Coffin v. Brown,* 94 Md. 190, cited above.

Kirby says the reference to him as "infamous" and the imputation that his motive in testifying against Hepbron was corrupt were untrue statements of fact. He contends earnestly that since the allegations were libelous as a matter of law and publication was conceded, only the issue of damages should have been submitted to the jury.[2]

It is not necessary to the determination of the only issues presented for decision by the record, as we see them, that we pass on the contention of Kirby that the publisher was treated more liberally and favorably by the trial court than it should have been. Judge Menchine instructed the jury that the critical words of the editorial made the publisher liable to Kirby unless they were privileged as fair comment. The only exceptions to the charge were (a) that it was error to limit the jury, in its consideration of whether the editorial was fair comment, to the words of the editorial itself and the two hearings referred to therein (which was consistent with the restrictions the court put on the publisher's opening statement and the introduction of testimony), and not allow consideration of Kirby's police department activities and record; and (b) that there was no evidence of actual malice sufficient to allow the jury to award punitive damages. On these instructions the jury found against the publisher, who has no justi-

2. In making this argument he admits that the testimony as to his Racket Squad activities and his Police Department record, on which the publisher sought to rely in bar of the action, would have been admissible for the purpose for which it was admitted— on the question of malice in relation to damages. *Cf.* Rigden v. Wolcott, 6 G. & J. 413, 417; Wagner v. Holbrunner, 7 Gill 296, 300; Shilling v. Carson, 27 Md. 175, 185; Negley v. Farrow, 60 Md. 158.

fiable complaint unless the instructions were erroneous, and the case turns on whether or not they were.

After Judge Menchine charged the jury that the words of the editorial were in and of themselves actionable "unless they were privileged as hereinafter defined," he instructed them that their duty was to decide whether they were privileged; that "[a] newspaper publisher, in common with any citizen, has the right * * * to discuss all matters of public interest and to comment on, criticize, and censure the official conduct of a police officer, even if such * * * comment is defamatory, provided [it] was the actual opinion of the writer and was made in good faith upon such facts appearing in the article itself or incorporated therein by reference as would justify a man of reasonable intelligence and judgment to make the same."

There followed the instructions which the publisher says were prejudicial and reversible error:

> "You are instructed that you will make the determination whether a man of reasonable intelligence and judgment was justified in using the language relating to Edgar Gordon Kirby by giving consideration only to the following evidence: (1) the entire editorial of June 17, 1959; (2) all of the evidence introduced in this Court by witnesses or exhibits or quotations from transcripts of testimony relating to the hearing before the Baltimore City Delegation; and (3) all of the evidence introduced in this Court by witnesses or exhibits or quotations from transcripts of testimony relating to the hearing before Governor Tawes.
>
> Consider that evidence and that evidence alone and make your decision on this question: 'Would a man of reasonable intelligence and judgment, with knowledge of that evidence, be reasonably justified in using the language of the editorial with respect to Edgar Gordon Kirby?'
>
> If your answer to this question is 'Yes,' then in law the language of the editorial would be fair com-

ment and privileged and your verdict must be for the Defendant.

If your answer to this question is 'No,' then in law the language of the editorial would be actionable and your verdict must be for the Plaintiff."

The publisher duly excepted to the failure of the court to instruct the jury that it could consider all the evidence in the case as to Kirby's activities as a member of the Rackets Division of the Police Department of Baltimore City, the official investigation and interrogations and the hearings or trials in which Kirby was in some way involved, including his interrogation by the Maryland State Police, the State's Attorney of Baltimore City and the Baltimore City Police, and the trials of Inspector Forrester and Lieutenant Goldstein of the Baltimore police force for subornation of perjury, as well as the Hepbron hearings before the Baltimore City Delegation and the Governor, to the extent (1) that such evidence related to the public acts of Kirby, (2) was shown to be within the knowledge of the publisher, and (3) was "readily available to the public." In synthesis it was as follows:

Kirby served in the Rackets Squad of the Baltimore Police Department first under then Sergeant Goldstein and, beginning in April 1957, as Acting Sergeant of his own squad. In September 1957, at the instance of Hepbron, Governor McKeldin asked the State police to investigate a report that Forrester and Goldstein were involved in immoral activities with a known prostitute. Kirby was twice interrogated by the State police in the course of the investigation. In October, Kirby was called before the Grand Jury of Baltimore in connection with the morals charges against Forrester and Goldstein, who were indicted and convicted of malfeasance and keeping a disorderly house. In October 1957, Forrester and Goldstein were indicted for subornation of perjury in connection with faked or planted evidence in numbers raids. At the trial it was testified that Goldstein, in Kirby's presence, instructed two policemen "how the actual arrest of a suspect had taken place." Kirby was a defense witness at the trial of Forrester and Goldstein, who were convicted. Later, in the fall of 1957, a

Sergeant Meekins told his police superiors that Kirby had given him false numbers slips to plant at raided places. Hepbron called a meeting on November 8, 1957, at which Kirby denied Meekins' accusation. When confronted by Meekins, Kirby called him a liar. Kirby was told to take a lie detector test or face charges. On advice of counsel Kirby refused to take the test and for this reason was suspended. Kirby's counsel publicly charged Hepbron with participation in illegal wire tapping. The Grand Jury investigated but returned no indictment. The Judiciary Committee of the Baltimore City Council held a hearing on illegal wire tapping, at which Kirby, on advice of counsel, refused to testify. Later, in five numbers cases in which Kirby had been a witness or involved, those who had been convicted were either released from prison or cleared. Some twenty-one indictments, in nineteen of which Kirby's name appeared among others as a witness, were stetted. In various of the cases Forrester's or Goldstein's name, or both, appeared in the list of witnesses.

On January 28, 1959, Kirby was charged by Hepbron with planting false evidence in one named raided place and of twice refusing to obey orders of a superior, one being the refusal to take the lie detector test. After a three day hearing, at which Meekins was the principal accuser, Hepbron found Kirby guilty and dismissed him from the force. Kirby appealed the dismissal to court and the case was pending when the editorial referring to him as "infamous" was published.

Kirby testified before the City Delegation on March 14, 1959, and before the Governor in May of that year. On both occasions he testified that Hepbron knew of illegal wire tapping practice in the Baltimore Police Department, and that on orders from Lieutenant Goldstein he had gone to the Emerson Hotel where he saw Hepbron and a well known underworld figure walk out of an elevator together, followed by two girls from a night club in "the Block" in Baltimore.

It is the publisher's contention that the facts just recited were enough to support the characterization of Kirby as infamous and that the preferable and controlling rule of law is that all relevant facts known or readily available to the public are admissible in evidence as a bar to a defamation ac-

tion under the defense of fair comment, even if they have not been set out or referred to in the publication. It relies on 3 *Restatement, Torts,* Sec. 606; 1 Harper and James, *The Law of Torts,* Sec. 5.28, pp. 458-9; and the case of *Kemsley v. Foot,* [1952] A. C. 345. Section 606 of the Restatement says in the black letter part that criticism as to matters of public concern and of the private conduct or character of one "engaged in activities of public concern, in so far as his private conduct or character affects his public conduct, is privileged * * * although defamatory," if it is upon a true statement of fact or upon facts otherwise known or readily available to the recipient as a member of the general public, is the actual opinion of the critic, and is not made solely to harm the other (and in addition, is a comment "a man of reasonable intelligence and judgment might make"). Comment (b) says:

> "Comment or criticism is an expression of the opinion of the commentator or critic upon the facts commented upon or criticised. If the facts are not known, a statement, though in form the expression of an opinion, carries with it the implication of facts to support it and is thus more than the mere expression of an opinion (see § 567). To be privileged comment under the rule stated in this Section, therefore, the facts upon which the opinion is based must be stated or they must be known or readily available to the persons to whom the comment or criticism is addressed, as in the case of a newspaper criticism of a play or a review of a book. Moreover, the facts upon which the criticism is based must either be true or, if untrue, the critic must be privileged to state them. * * *"

1 Harper and James, *The Law of Torts,* Sec. 5.28, pp. 458-9, says:

> "[I]t follows that criticism is privileged as fair comment only when the facts on which it is based are truly stated or privileged or otherwise known either because the facts are of common knowledge or because, though perhaps unknown to a particular re-

cipient of the communication, they are readily accessible to him. If the facts criticized or commented upon are not stated or known, fair comment is no defense. The reason for this rule, of course, is this: an opinion must be based on facts; if the facts are not known, the opinion carries with it the implication of facts which will justify it. * * *"

The authority cited by the authors for the statement as to facts being readily accessible is the Restatement section above quoted. They add: "Of course, the reviewer of a book is not required to set forth the full text of the book which he criticizes." *Id.* at 459, n. 15.

In *Kemsley v. Foot, supra,* a newspaper article headed "Lower than Kemsley" was involved, which was an attack on papers published by Lord Beaverbrook. Lord Kemsley and Lord Beaverbrook were famous newspaper publishers, well and widely known by the English public. The question for determination was whether the defense of fair comment was available. Kemsley, who had sued the newspaper which published the article, claimed that no facts were set out in the article to support any comment. Lord Porter said his views on this matter were well expressed by *Odgers on Libel and Slander* (6th ed. 1929), p. 166:

"If the defendant accurately states what some public man has really done, and then asserts that 'such conduct is disgraceful,' this is merely the expression of his opinion, his comment on the plaintiff's conduct. So, if without setting it out, he identifies the conduct on which he comments by a clear reference. In either case, the defendant enables his readers to judge for themselves how far his opinion is well founded; and, therefore, what would otherwise have been an allegation of fact becomes merely a comment. But if he asserts that the plaintiff has been guilty of disgraceful conduct, and does not state what that conduct was, this is an allegation of fact for which there is no defense but privilege or truth. The same considerations apply where a defendant has

drawn from certain facts an inference derogatory to the plaintiff. If he states the bare inference without the facts on which it is based, such inference will be treated as an allegation of fact. But if he sets out the facts correctly, and then gives his inference, stating it as his inference from those facts, such inference will, as a rule, be deemed a comment. But even in this case the writer must be careful to state the inference as an inference, and not to assert it as a new and independent fact; otherwise, his inference will become something more than a comment, and he may be driven to justify it as an allegation of fact."

Lord Porter went on to say that the result must depend on all the circumstances, and the inquiry was whether there was in this case "sufficient subject-matter upon which to make comment." He said it was at least arguable that the article implied as a fact that Lord Kemsley is in control "of a number of known newspapers" and suggested that the comment was that these papers are low. He thought that in this sense the criticism did not differ from that which takes place when what is called literary criticism comes into question, and continued:

"In such case the attack is not on the personal character of the person libelled, it is upon him as responsible for certain productions, e. g., an article in the press, a book, a musical composition, or an artistic work.

\* \* \*

If an author writes a play or a book or a composer composes a musical work, he is submitting that work to the public and thereby inviting comment. \* \* \*

The same observation is true of a newspaper. Whether the criticism is confined to a particular issue or deals with the way in which it is in general conducted, the subject-matter upon which criticism is made has been submitted to the public, though by no means all those to whom the alleged libel has been published will have seen or are likely to see the vari-

ous issues. Accordingly, its contents and conduct are open to comment on the ground that the public have at least the opportunity of ascertaining for themselves the subject-matter upon which the comment is founded. I am assuming that the reference is to a known journal: for the present purpose it is not necessary to consider how far criticism without facts upon which to base it is subject to the same observation in the case of an obscure publication."

It seems evident that the bases of decision were (1) that the reference to the Kemsley newspaper was equivalent to criticism of a book or play,[3] in that the quality of his newspapers was as readily determinable by those who read the criticism as that of a criticised book or play; and (2) that "[i]n the present case, for instance, the substratum of fact upon which comment is based is that Lord Kemsley is the active proprietor of and responsible for the Kemsley Press," so that there was a sufficient basis of fact from which to launch criticism or comment ("The criticism is that that press is a low one."). Lord Porter added that, in his analysis of the case, "I am not conscious of being at variance with the authorities * * *."

We think that to sustain fair comment, facts which are set out in the publication must be truly stated (if they are unprivileged), and that such a fact which is not set out must both be true and be so referred to in the publication as to be either recognizable or be made identifiable and easily accessible. *Merivale v. Carson,* 20 Q. B. D. 275 (1888); *Parsons v. Age-Herald Pub. Co.,* 61 So. 345, 350 (Ala.); *State Press Co. v. Willett,* 245 S. W. 2d 403, 404-5 (Ark.); *Howard v. Southern California Associated Newspapers,* 213 P. 2d 399, 403 (Cal. D. C. App.); *Eikoff v. Gilbert,* 83 N. W. 110 (Mich.); *Edmonds v. Delta Democrat Publishing Company,* 93 So. 2d

---

**3.** Lord Porter said: "I have thought it right to set out the basis of literary criticism * * * because a distinction is sought to be drawn and, indeed, in some of the decided cases, has been drawn between literary criticism and a personal attack upon the character of an individual."

171, 173-4 (Miss.) ; *Leers v. Green,* 131 A. 2d 781, 787-8 (N. J.) ; *Cohalan v. New York World-Telegram Corp.,* 16 N. Y. S. 2d 706, 710-711; *Cohalan v. New York Tribune,* 15 N. Y. S. 2d 58, 61.

The two New York cases last cited and the earlier case of *Foley v. Press Pub. Co.,* 235 N. Y. S. 340, 351-2, on which they relied, were the substantial basis for the action of Judge Menchine in forbidding the publisher in opening statement and in testimony to avail itself of, and the jury to consider in bar of the action, the activities and conduct of Kirby not specified or referred to in the editorial, and we find that they and the other authorities cited justify his rulings under the facts here. In the *New York Tribune* case, at p. 60, it is said:

> "The requirements of a defense of fair comment have been set forth in Foley v. Press Publishing Co., 226 App. Div. 535, 235 N. Y. S. 340, in which Mr. Justice Proskauer, writing for the court, held that in order to acquire defeasible immunity a publication purporting to be fair comment on a subject of public interest must be (1) comment, (2) *based on facts truly stated or referred to,* (3) free from imputations of corrupt or dishonorable motives on the part of the person whose conduct is criticized, save in so far as such imputations are warranted by the facts truly stated, and (4) the honest expression of the writer's real opinion." (Emphasis supplied.)

Gately, *Libel and Slander* (4th ed. 1953), p. 340-1, says: "So the context may show that the defendant, in alleging that a public man has been guilty of some disgraceful or dishonourable conduct, or has been actuated by corrupt or dishonourable motives, bases such allegations on *facts which he truly states or clearly refers to.* In such a case his allegations, if fairly warranted by these facts, may be defended as comment on, or reasonable inference from, such facts. It is for the jury, subject to the direction of the judge, to decide whether in the particular case the defendant's allegations are allegations of fact or ex-

pressions of opinion, and, if expressions of opinion, whether such expressions of opinion are fairly warranted by the *facts truly stated or referred to.*" (Emphasis supplied.)

It is of interest that the English Defamation Act of 1952, 15 & 16 Geo. 6 & 1 Eliz. 2, c. 66, s. 6, provides that:

"In an action for libel or slander in respect of words consisting partly of allegations of fact and partly of expression of opinion, a defence of fair comment shall not fail by reason only that the truth of every allegation of fact is not proved if the expression of opinion is fair comment having regard to such of the *facts alleged or referred to* in the words complained of as are proved." (Emphasis supplied.)

Aside from the allegations of infamy and corrupt motive, there are no facts in, or referred to in, the editorial before us as to Kirby in respect of anything but the Legislative hearing and the Governor's hearing, and the writer of the editorial admitted there was nothing derogatory to Kirby in connection with those hearings. There is nothing in the editorial to lead the reader to reasons why the writer thought Kirby was infamous or a man with a motive, or why the reader should. The linking of his name to Forrester and Ford was not a sufficient reference to the record relied on by the publisher, and there was nothing in the editorial to lead the reader to that search of the newspaper archives which would have been required to reconstruct that record.

We turn to the appellant-publisher's second main claim of error—that there was no evidence of such malice as would permit the award of punitive damages and that the court erred in not so charging the jury, over its duly taken exception. It did not except to the charge as delivered that punitive damages were allowable only if the jury found the publication to have been malicious and wanton and that malice need not necessarily imply ill will or hatred but in law will exist if the

editorial was reckessly written without reasonable justification or excuse.

We think there was evidence (in addition to the lack of any fact stated or referred to in the editorial sufficient to warrant a man of reasonable intelligence and judgment in characterizing Kirby as an infamous man with a corrupt motive) from which the jury could have concluded that the editorial was written recklessly without reasonable justification or excuse. The writer of the editorial said that he called Kirby infamous in the ordinary meaning of the term by reason of his activities as a policeman, although he admitted that when he wrote the editorial he knew Kirby had appealed his departmental discharge to court and the appeal was then pending, as well as that Kirby had not then been charged or indicted for any crime, and that nothing set out or referred to in the editorial justified the use of the term. Moreover, while he stressed in his testimony the careful procedure ordinarily used in the preparation of editorials so that libelous words will not be used ("Every member of the staff reads them carefully, to raise flags against errors of fact. * * * the news department generally understands that anything seen like that in the course of early editions should be called to my attention, and that is done frequently. * * * things that might be unjustified comment on individuals, errors of fact."), he did not claim this procedure was followed in the preparation of this editorial. He said his reference to Kirby, Forrester and Ford (now Chief of Police of Howard County) was in relation to the testimony before the "kangaroo court" only, but conceded he had erred in that Forrester did not testify at that hearing. While not suggesting that we agree, we find enough to have permitted the jury to conclude that the editorial had been written more in anger than in sorrow and that there had been a reckless disregard for Kirby's reputation, in calling him infamous without stating or referring to any fact that reasonably justified the characterization. The point sought to be made could have been made by saying, "Kirby, who was discharged from the Police Department on a charge of failing to take a lie detector test after he had been charged with faking evidence," or some similar statement of fact.

Finally, the appellant-publisher assigns error in the refusal of the trial court to request Chief Judge Niles of the Supreme Bench of Baltimore City to order the reporter for the Grand Jury of Baltimore to produce his records before Judge Menchine to show that Kirby had been before the Grand Jury in twenty-one cases which had been stetted. Kirby had said he had no recollection whether he did or not. It was and is conceded that Kirby did not deny he had been before the Jury and the testimony of the reporter would thus not have revealed a conflict. We see no prejudicial error in the refusal to require the testimony sought.

*Judgment affirmed, with costs.*

PRESCOTT, J., filed the following opinion, dissenting in part.

I regret that I am unable fully to concur in the majority opinion herein. I, also, regret that time will not permit a comprehensive statement of the reasons for such inability; however, it would be a dereliction of duty not to outline the same, as this is a case of considerable importance, guiding and limiting, as it does, the news media of this State.

The decision affirms a judgment in the amount of $45,000. The judgment was rendered as a result of an editorial comment, wherein the appellee was referred to as "infamous," and it was stated that he, when a witness against Commissioner Hepbron at a hearing before the City Delegation on March 13 and 14, 1959, was "a man with a motive." (Kirby had been suspended by Hepbron, and was formally charged, tried and found guilty by Hepbron in February, 1959, of "planting" evidence in the 408 Bar raid.) The defense, as is quite usual in this type of case, was "fair comment," and whether this defense be considered as a "qualified privilege," or "without the scope of actionable defamation," it is a complete bar when properly established.

The judgment was obtained below, and is sustained here, by *limiting* the evidence on the issue of "fair comment" to what transpired at two hearings held in Annapolis on charges against Commissioner Hepbron (one before the City Delegation and the other before Governor Tawes), and the rather

technical and thin distinction as to whether the statement that Kirby was "infamous" and "a man with a motive" was a "misstatement of fact" (with the evidence limited as noted above), or an "expression of opinion."

I shall not detail all of the evidence against Kirby that was *excluded from consideration* on the question of "fair comment." In narrative form, it consumes more than thirteen pages of appellant's brief. It discloses an illegal, disgraceful, and reprehensible course of conduct by an officer of the Police Department, whose duty it was to uphold the law and sustain the dignity of, and the public confidence in, his said Department. This evidence shows his close association with other members of the Department who were dismissed from the Department and convicted of crimes; his close association with one member who committed suicide when the Department was under investigation; that he knew, and probably participated in the production, of perjured testimony being given by other officers to obtain convictions in a criminal case; that in one case, after a Judge of the Supreme Bench had found a man guilty of a crime, principally upon Kirby's testimony, the verdict and sentence were stricken and the man released, the Judge obviously finding, after subsequent investigation, that Kirby had deliberately "framed" the defendant by false testimony; and that he was accused by a fellow officer of having that officer produce and present at a magistrate's hearing false evidence against two defendants, and, after their being sentenced to prison by a Judge of the Supreme Bench, upon stipulation of the State's Attorney that "fraudulent evidence" had been used at their trial, they were released.

This excluded from consideration on the fair comment issue evidence further disclosed that when he was accused by his fellow officer, as noted above, he first agreed to take a lie-detector test, which he later declined to do; that he was then ordered by the Commissioner to take the test, but he refused; that he was then suspended from the force; that he was requested by the Judiciary Committee of the City Council, who were conducting an investigation of alleged illegal wire tapping, to testify before them, which he declined to do; that due to the scandals involving Kirby and other members

of the Rackets Division, thirty, or more, gambling indictments were stetted because "of the State's inability to produce the necessary credible evidence required for successful prosecution"; and that he was formally charged by the Commissioner with planting false evidence and of twice refusing to obey orders of a superior officer, found guilty on all three charges and dismissed from the force. Most, if not all, of this was aired in the public press and was readily accessible to the public at large. The record discloses that Kirby's name appeared no less than 183 times in 65 newspaper articles offered in evidence; 23 times his name was in headlines, and three times his photograph accompanied the articles.

To me, the above clearly establishes the fact that Kirby was "infamous," and "a man with a motive" when he appeared against Commissioner Hepbron at the hearing in Annapolis. A policeman, whose sworn duty it is to obey the law and protect the State's citizens, who deliberately plants evidence and has others commit prejury in order to obtain convictions in criminal cases, is so obliquitous that it is difficult to use polite but appropriate language to describe him adequately. And, without reciting or analyzing, at any great length, the authorities which are ably and, to me, convincingly set forth in appellant's brief, it seems clear that the above evidence was admissible on the issue of "fair comment," and it demonstrates that the statements made in the publication were "fair comment," and not actionable. In fact, when Kirby's background is considered, the statements should, perhaps, be termed "complimentary comments," for, if ordinary parlance were permissible, there immediately come to mind many adjectives and terms that are far less complimentary, although not less expressive.

To me, the result reached by the majority is so regretable, and the law so plainly shows that an opposite conclusion is the proper one, that it is difficult to refrain from setting forth and analyzing the authorities in a rather extensive mode; however, I shall do so only briefly. The crucial point of the majority opinion, as was the decision of the trial court in excluding the evidence outlined above, is based mainly upon two decisions of one-man courts of original jurisdiction

in New York (from this, it is safe to assume that the Court of Appeals of that state has not, as yet, rendered a decision to like effect). But even if these court decisions are followed, it does not require the result reached by the majority, as is shown by the following quotation from *Cohalan v. New York Tribune, Inc.,* 15 N. Y. S. 2d 58, one of said decisions, when the court, in sustaining the sufficiency of a plea of fair comment, said: "On the basis of the facts stated in the editorials *and the other facts alleged in the defenses* a jury might find that the conclusions and comment contained in the editorials were *within the realm of fair comment.* * * * Nor does there appear to be any merit in plaintiff's contention that *all* the true facts forming the basis of the so-called fair comment must be found within the four corners of the allegedly defamatory editorials. * * * The facts relied upon in the editorials involved in the present action had become matters of public record prior to the publication of the editorials [as had happened in the case at bar], and as such were accessible to any one who wished to examine the record. *They did not have to be specifically enumerated and described in the editorials themselves in order to confer defeasible immunity upon the defendant."* (Italics supplied.)

Section 606 of Restatement, *Torts,* cited by the appellant, also seems directly in point and correctly states the rationale of the decisional law on privileged criticism. It reads:

> "(1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, although defamatory,
> (a) is upon,
>> (i) a true or privileged statement of fact, or
>> (ii) upon facts otherwise known or available to the recipient as a member of the public, and
> (b) represents the actual opinion of the critic, and
> (c) is not made solely for the purpose of causing harm to the other.
> "(2) Criticism of the private conduct or character

of another who is engaged in activities of public concern, insofar as his private conduct or character affects his public conduct, is privileged, if the criticism, although defamatory, complies with the requirements of Clauses (a), (b) and (c) of Subsection (1) and, in addition, is one which a man of reasonable intelligence and judgment might make."

See also *Hammett v. Times-Herald, Inc.,* No. 7066 U. S. D. C. for the District of Maryland, wherein Judge Thomsen gave a charge based upon this section; 1 Harper & James, *Law of Torts,* pp. 458, 459; *Roerich v. Sun Print. & Publ. Ass'n,* 296 N. Y. S. 151; Odgers, *Libel & Slander,* pp. 515, 516; and the additional authorities cited by the appellant on pp. 25-41 of its brief.

I conclude the authorities with two short quotations: the first is from 1 Poe, *Pleading & Practice,* § 183; the second from this Court's opinion in *McBee v. Fulton,* 47 Md. 403, 426.

"* * * the received American doctrine is that so long as the press does not convert itself into an organ by which, under pretense of promoting the public good, private rancor, personal hostility and individual malice are really sought to be gratified, it must be left free to discuss, almost without restriction, not only the end and aim of every public measure, but also the character and conduct, together with the personal qualifications of every public man * * *."

"Such reports [newspaper account of a preliminary hearing before a Justice of the Peace] are now and have long been daily made in almost all the public journals of the country, and we are of opinion they are thus privileged * * *. This privilege, which may be set up under the plea of not guilty, is, as we have seen, not absolute, but qualified. The qualifications or limitations attached to it have already been indicated. The reports * * * must be substantially correct and not garbled or partial, and made *bona fide* or without malice, and whether they are of this character is

in all cases where this defense is set up * * * a question of fact for the jury. And the same thing is true of the comments accompanying such reports; they must be correct and fair and it is for the jury to say whether they are so or not."

It is difficult to see how the jury could intelligently make this determination in the case at bar, with the vital and critical evidence bearing upon the issue eliminated from their consideration. Just because the evidence offered herein on the defense of "fair comment" proved more than was necessary for such a defense (and, in fact, established the truth of the publication complained of) did not render it inadmissible. *Chapman v. Calder*, 14 Pa. (2 Harris) 365; *Rosenberg v. Mason*, 160 S. E. 190 (Va.). Cf. *Foley v. Hoffman*, 188 Md. 273.

It has always been dangerous to plead justification in Maryland; after the decision of *Domchick v. Greenbelt Services*, 200 Md. 36, it became almost prohibitive (see 13 Md. L. Rev. 357); now the decision in the instant case, paring down and circumscribing the defense of fair comment, seems to place the publishers almost in a strait jacket, which, to me, is most undesirable and contrary to "the received American doctrine" as enunciated by Professor Poe.

I agree with that portion of the majority opinion which holds that it was not prejudicial error to refuse to require the production of the records of the Grand Jury reporter.