BERNARD KAPILOFF AND LEONARD KAPILOFF
T/A MORKAP PUBLISHING ET AL. *v.*
FRED L. DUNN, JR. ET AL.

[No. 840, September Term, 1974.]

*Decided July 23, 1975.*

The cause was argued before ORTH, C. J., and GILBERT and LOWE, JJ.

*James J. Doyle, Jr.*, with whom were *John B. Jaske, Wallace E. Hutton* and *Sherbow, Shea & Doyle* on the brief, for appellants Bernard and Leonard Kapiloff t/a Morkap Publishing Company, Roger B. Farquhar and William H. Bancroft, Jr.

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, January 7, 1976.

*Richard M.. Cooper*, with whom were *Joseph A. Califano, Jr., John B. Kuhns, Williams, Connolly & Califano* and *Wallace E. Hutton* on the brief, for Robert Woodward, other appellant.

*Walter H. Madden*, with whom were *Michael Francis O'Connor, Thomas D. Murphy* and *Edwin F. Nikirk* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

In this libel action the defamed was a public figure claiming injury to his reputation because of a statement, which was a matter of public concern, affecting him in his calling, published by a newspaper of general circulation. Therefore the right to recover was clearly governed by *New York Times Co. v. Sullivan*, 376 U. S. 254. *New York Times*, through the Fourteenth Amendment to the Constitution of the United States, impressed on the Maryland law of defamation the First Amendment freedoms of free speech and press.[1] Holding that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct," 376 U. S. at 283, "[t]he *New York Times* standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth."[2] *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 342. *Gertz*, at 342-343, expressly reaffirmed the *New York Times* standard:

---

1. "Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ." Amendment I, Constitution of the United States.

2. *New York Times* made applicable the "rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless

"This standard administers an extremely powerful antidote to the inducement of media self-censorship of the common law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. Despite this substantial abridgement of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures. *New York Times Co. v. Sullivan, supra; Curtis Publishing Co. v. Butts* [388 U.S. 130]. We think that these decisions are correct, but we do not find their holdings justified solely by reference to the interest of the press and broadcast media in immunity from liability. Rather, we believe that the *New York Times* rule states an accommodation between this concern and the limited state interest

disregard of whether it was false or not." 376 U. S. at 279-280. It declared that the constitutional standard demands that proof of actual malice be shown with "convincing clarity." *Id.* at 285-286.

Time, Inc. v. Hill, 385 U. S. 374, 387, set out the *New York Times* holding thusly: "In New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686, we held that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct. Factual error, content defamatory of official reputation, or both, are insufficient for an award of damages for false statements unless actual malice — knowledge that the statements are false or in reckless disregard of the truth — is alleged and proved."

In Rosenbloom v. Metromedia, Inc., 403 U. S. 29, 30 the Court explained the *New York Times* holding in this manner: "*New York Times* held that in a civil libel action by a public official against a newspaper those guarantees [of the First Amendment] required clear and convincing proof that a defamatory falsehood alleged as libel was uttered with 'knowledge that it was false or with reckless disregard of whether it was false or not.' *Id.,* at 280, 84 S. Ct., at 726. The same requirement was later held to apply to 'public figures' who sued in libel on the basis of alleged defamatory falsehoods."

See Rosenblatt v. Baer, 383 U. S. 75, 77.

present in the context of libel actions brought by public persons." [3]

## FACTS

On 18 March 1971 The Montgomery County Sentinel published an article entitled "Our High School Principals: How Good Are They?" The byline read: "By Bob Woodward and Bill Bancroft Sentinel Reporters." An introduction, entitled "Rating of Principals", set out the source material for the article and the basis of the ratings:

> "Each principal was evaluated on the degree to which The Sentinel and those students, parents, and teachers interviewed believe he has established a positive, open learning atmosphere in his high school — the extent to which he leads instead of drives the students.
>
> After weeks of visiting the schools, watching them in action and interviewing students, faculty, parents, and the principals themselves, The Sentinel has attempted to portray the flavor of each school and rate each principal as to how well he is meeting the critical challenge of this uniquely important job in these challenging — and difficult times.
>
> These ratings, which grew out of our own observations as well as those of the many people with whom we talked, appear below with the portraits of the 22 high schools."

The ratings were arranged in table form. Each "Principal" was listed, followed by his "School" and "Rating". Four separate evaluations were used: "Outstanding", "Good", "Poor" and "Unsuited". Eight principals were classified as outstanding, eight as good, four as poor and two as unsuited.

---

3. The Court went on to say, 418 U. S. at 344-348, that the state interest in compensatory injury to the reputation of private individuals requires that a different rule should obtain with respect to them. See Sindorf v. Jacron Sales Co., Inc. 27 Md. App. 53, and General Motors Corporation v. Piskor, 27 Md. App. 95.

The article itself contained a profile of each high school which attempted to describe the educational atmosphere at that school and the effect which the philosophies of the individual principal had on that atmosphere. As the introduction indicated, principals with more liberal attitudes toward "innovative programs" were given the highest ratings while those taking a more conservative approach to change received the lowest ratings.

Dr. Fred L. Dunn, Jr., principal at Robert E. Peary High School in Rockville, received one of the two "unsuited" ratings. The article's profile of Peary reflected this rating:

"Two assistant principals walk side by side in the hallways during the lunch period like two policemen walking their beat.

They are making sure that none of the students on their lunch break will enter the hallways and inadvertently disrupt class.

It is a daily ritual at Robert E. Peary High School in Rockville where the tone of the school set by Principal Dr. Fred L. Dunn is disciplined education.

Dunn has few if any, innovative programs in the educational regime and students, staff and the community are embroiled in controversy over changes that should be made to bring the school up to date.

Dunn admits that there have been few changes in the curriculum at Peary and that those changes have all been cleared through the curriculum department at the board of education's central office.

Students and some parents complain vigorously that the atmosphere at Peary is stifling and boring. One can sense the open hostility between many students and Dunn.

Many of the parents in the Peary community, however, are pleased with Dunn's handling of the school. They give the most support to his policies on

discipline — policies which sometimes seem to override the teaching going on in the classrooms.

Students who break any rules will be virtually assured of a severe reprimand and a call home to parents advising them of the infraction of school rules.

A number of teachers are known to be dissatisfied with Dunn and according to John P. Fiscella, director of employee relations for the teachers' association, Dunn is currently 'harassing' teachers through their evaluations.

The school newspaper is heavily censored and that has caused resentment on its staff.

The Peary school community reacted strongly — both for and against Dunn — when the school superintendent · recommended that he be transferred. After much controversy the school board decided against the move.

When Dr. Dunn banned several controversial speakers invited by students to their seminar day about 350 students staged a protest march to school board headquarters."

## STATEMENT OF THE CASE

Dr. Dunn viewed the article and its rating as an attack upon his professional qualifications. He, his wife, Janet Griffith Dunn, and his daughter, Janet Elizabeth Dunn, a minor, by and through her father as her next friend, instituted an action for libel on 10 September 1971 by filing a declaration in the Circuit Court for Montgomery County (Law No. 34900) against The Montgomery County Sentinel, the MORKAP Publishing Company, Bernard Kapiloff and Leonard Kapiloff, owners of The Sentinel, Robert B. Farquhar, editor of The Sentinel, Bob Woodward and Bill Bancroft, reporters. Amendment subsequently made deleted the first four and substituted therefor "Bernard Kapiloff and Leonard Kapiloff, co-partners, Doing Business as Morkap Publishing Co." In the 1st count of the declaration

Dr. Dunn claimed compensatory damages of $5,000,000 and punitive damages of $10,000,000 for the libel of him.[4] On 15 October the defendants filed a "General Issue Plea." Upon suggestion the case was removed to the Circuit Court for Frederick County (Law No. 7250) by order of 26 November. On 24 May 1972 the defendants moved for summary judgment, raising the defense of constitutional privilege. By an order issued on 30 August the motion was denied.

Trial commenced on 3 December 1973. A dispute concerning pre-trial discovery which arose prior to that date, however, spilled over into the trial. In an affidavit dated 4 April 1972, Farquhar asserted that after the article had been prepared and prior to publication it had been reviewed by "three high-ranking employees of the Montgomery County School Board" who all agreed with the rating given Dr. Dunn. At a deposition taken on 1 February 1973 Farquhar was asked to identify these individuals. He refused on the ground that they were confidential news sources whose identity he had sworn not to reveal. After a hearing the court issued an order on 21 September compelling Farquhar to answer the question. Farquhar moved to rescind the order. The court denied the motion. When Farquhar was re-deposed on 18 October he again refused to reveal the identity of the three employees. On 1 November Dr. Dunn moved for judgment by default against Farquhar pursuant to Rule 422 c. The court issued an order dated 30 November compelling reporters Woodward and Bancroft to disclose the identity of the sources. When they also refused, Dr. Dunn filed a motion on the second day of trial (4 December) for a default judgment against them. On the same day, upon

---

4. In the 2nd count Dr. Dunn and his wife claimed $1,000,000 compensatory damages and $2,000,000 punitive damages for loss of consortium. In the 3rd count Dr. Dunn, his wife and his daughter claimed $1,000,000 compensatory damages and $2,000,000 punitive damages for interference with the family relationship. The defendants demurred to the 2nd and 3rd counts. A hearing was held on 7 April 1972 and the demurrer was sustained with leave to amend within forty-five days. On 29 September the plaintiffs moved to amend and filed an amended declaration. The defendants again demurred. On 24 October the court granted the motion to amend but on 9 February 1973 sustained the demurrer without leave to amend. On 9 March the plaintiffs filed an appeal from that order. They withdrew their appeal without prejudice on 9 April.

hearing, both of Dunn's motions were denied but Farquhar, Woodward and Bancroft were "barred from asserting or causing to be asserted in any manner on their behalf whether by affirmation, implication or denial that the article or anything relating to Dr. Dunn . . . was reviewed by any employees of the Montgomery County School Board."

At the close of Dr. Dunn's case on 5 December the defendants moved for a directed verdict. The court reserved its ruling. See Rule 552 c. At the end of the defendants' case they renewed their motion for a directed verdict and the court again reserved its decision. A separate motion was made on behalf of defendant Woodward on the ground that no evidence was presented to show that he had anything to do with the rating.[5] This motion was denied.

The case went to the jury on 11 December and the same day they returned a verdict in favor of Dr. Dunn.[6] On 13 December the defendants filed a "Motion for Judgment N.O.V. and New Trial." After a hearing on 5 March that motion was denied,[7] and final judgment was entered. The defendants filed an appeal.[8] Dunn filed a cross-appeal on 4 April but it was dismissed at his request on 3 January 1975.

---

5. All defendants were originally represented by one firm. Woodward later engaged separate counsel to present his defense of lack of responsibility. On appeal a separate brief was filed on behalf of Woodward. For the purposes of deciding this appeal the issues raised were substantially the same as those in the brief filed on behalf of the other defendants. Therefore this opinion will discuss the contentions raised on appeal as made by all defendants together.

6. The jury awarded $250,000 in compensatory damages and $106,000 in punitive damages as follows: $500 against each of Woodward and Bancroft, $5,000 against Farquhar and $100,000 against the Kapiloff brothers as partners in the Morkap Publishing Company. On remittitur the court reduced the compensatory damage figure to $175,000.

7. Under Rule 552 c, failure to grant judgment *n.o.v.* under Rule 563 constituted a denial of the directed verdict motion upon which the court had reserved its decision at the close of all the evidence. See note 9, *infra.*

8. The typed docket entries included in the record on appeal indicated that the appeal was noted before the entry of final judgment. This transcription was a true reflection of the handwritten entries but included them in the wrong order. On 26 February 1975 the defendants moved to correct this error. On 19 March they filed a "Certificate" signed by the Clerk of the Circuit Court for Frederick County showing that final judgment was entered before the filing of the appeal. This Court considered the motion during oral argument and passed an order dated 28 April which granted the motion correcting the order of the docket entries.

## ISSUE FOR DECISION

This Court, like the Supreme Court of the United States, must in proper cases review the evidence to make certain that constitutional principles applicable have been constitutionally applied. This is such a case, particularly since a question posed by all the appellants is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated. As the Court said in *New York Times*, at 285:

> "In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' Pennekamp v. Florida, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295; see also One, Inc., v. Olesen, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352; Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352. We must 'make an independent examination of the whole record,' Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression."

See *A. S. Abell Co. v. Barnes*, 258 Md. 56, 71.

Appellants claim error in the refusal of the trial court to grant a directed verdict in their favor.[9] They assert that the rating of Dunn was an expression of an opinion on the conduct of a public figure and therefore "cannot be made the

---

9. The reservation of decision on the motion for a directed verdict made at the close of all the evidence constituted a denial thereof, there being no judgment n.o.v. rendered for the moving party. Maryland Rule 552 c. Therefore, in reviewing the trial court's action on the motion, we must assume the truth of all credible evidence tending to sustain the contentions of Dunn, as well as all credible inferences of fact reasonably and fairly deducible therefrom. Trionfo v. R. J. Hellman, Inc., 250 Md. 12, 15; Buchanan v. Galliher, 11 Md. App. 83, 87-88.

subject of a libel action." They argue that even if the rating was a statement of fact, as distinguished from an opinion, it was made without knowing falsity or reckless disregard of its truth and thus was under the protection of the constitutional privilege.

It is plain that as a high school principal in Rockville, Dunn was within the "public figure-public official" classification [10] and that his suitability for the position was a matter of public or general interest or concern.[11] The right of Dunn to recover for any injury to his reputation by the libel here must be tested by the *New York Times* standard.

## EXPRESSION OF OPINION

Appellants contend that "as long as a commentator expresses opinions on the conduct of a public official and the qualifications and performance of public officials, his opinions are completely privileged under the First Amendment." They cite from *Gertz v. Welch*, 418 U. S. 323, 339-340 to support this contention: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Appellants reach the following conclusion:

---

10. We pointed out in *Sindorf*, at 74 that the Supreme Court in Rosenblatt v. Baer, *supra*, suggested the minimal perimeters of the public official classification, and we set out in footnote 10 those who had been held to be public officials in a series of decisions. We noted that the constitutional privilege had been extended to public figures in Curtis Publishing Co. v. Butts, *supra*, and its companion Associated Press v. Walker, 388 U. S. 130, and that thereafter the Court engaged or acquiesced in a progressive expansion of the public figure category into decreasingly public spheres. Since *Butts*, public officials and public figures are equally subject to the constitutional privilege.

11. For a full discussion of a matter of "public or general concern or interest" see *Piskor*, at 107. The Supreme Court has used the terms "public or general interest" and "public or general concern" synonymously. See Rosenbloom v. Metromedia, *supra*, at 44. We said in *Piskor*, note 7 at 107, that we so consider them. See also Bigelow v. Virginia, U. S., decided 16 June 1975, in which the Court discussed whether a commercial advertisement was of public interest. Determining that it was, the Court observed that the advertisement conveyed information of potential interest and value to a diverse audience, so that First Amendment interests coincided with the constitutional interests of the general public.

"The Supreme Court has ruled that state libel judgments may not be imposed for expressions of opinion. The reason for this rule is that an opinion cannot be subjected to the test of truth or falsity. Thus opinions cannot be judged by a court or jury. Put another way, litigants who attack or defend expressions of opinion cannot meet any 'burden of proof' placed on them by the law of libel. The attacker cannot objectively prove 'falsity'; the defender cannot objectively prove 'truth'.

In this case Dunn had the initial burden of proving objective falsity by clear and convincing evidence. He failed for the same reason the Supreme Court ruled opinions may not be challenged as libelous. He could only prove that his superiors believed he was suited to be principal. He could not prove that the Sentinel's opinion of him was objectively false."

It is correct that statements of opinion concerning matters of public interest are privileged, but generally the privilege is qualified, not absolute. In *A. S. Abell Co. v. Kirby*, 227 Md. 267, a police officer instituted a libel action against a newspaper for publishing an editorial which labeled him "infamous." The newspaper defended on the grounds that the editorial was fair comment on a matter of public interest. The trial judge instructed the jury on the defense of fair comment and submitted the case to them on that issue. The jury returned a verdict in favor of the officer and the newspaper appealed. The Court of Appeals delineated the defense of fair comment. It explained that "a newspaper like any member of the community may, without liability, honestly express a fair and reasonable opinion or comment on matters of legitimate public interest." *Id.* at 272.[12] It

---

12. Noting that there was a controversy over whether fair comment is a qualified privilege or whether such a publication is merely outside the scope of actionable defamation, the Court found that the practical effect was the same and did not select one viewpoint over the other. It quoted, however, from 1 F. Harper and F. James, *The Law of Torts* § 5.28 at 457 (1954), which indicates a preference for the privilege concept because actual malice will destroy the immunity granted by the privilege. 227 Md. at 272, note 1.

noted, however, that in Maryland, as in the majority of states, the protection of fair comment did not extend to publications containing misstatements of fact as distinguished from expressions of opinion:

"The majority of the States (perhaps three-fourths) hold that the immune instances of public discussion are those limited to opinion, comment, and criticism, and do not embrace those in which there is any false assertion of defamatory fact. See, for example, *Washington Times Co. v. Bonner*, 86 F. 2d 836 (D. C. Cir.); *Post Pub. Co. v. Hallam*, 59 F. 530 (C. C. A. 6th) (*per* Taft, J.); *Hubbard v. Allyn*, 86 N. E. 356 (Mass.); *Burt v. Advertiser Newspaper Co.*, 28 N. E. 1 (Mass.) (per Holmes, J.); *Eikhoff v. Gilbert*, 83 N. W. 110 (Mich.); 1 *Harper and James, op. cit. supra*, p. 458-9; *Prosser, op. cit. supra*, p. 621-2; Annotations, 150 A.L.R. 358, 110 A.L.R. 412, 1918 E L. R. A. 21. The American Law Institute reversed the view taken in its tentative draft and adopted the majority view. See 3 *Restatement, Torts*, 598, comment a, discussed in Note, *Fair Comment*, 62 Harv. L. Rev. 1207, 1212. The minority view, that even false statements of fact are privileged, at least as to public officers and candidates, if they are made for the public benefit with an honest belief in their truth (because the public interest demands that those who are in a position to furnish information about public servants should not be deterred by fear of suit), has long been favored by many commentators but there has been no rush by the Courts to adopt it. See Noel, *Defamation of Public Officers*, 49 Col. L. Rev. 875, 891-900; Comment, *Developments in the Law — Defamation*, 69 Harv. L. Rev. 875, 928." *Id.* at 273.

The Court explained the difference between a statement of fact and an expression of opinion:

"The distinction between 'fact' and 'opinion,'

although theoretically and logically hard to draw, is usually reasonably determinable as a practical matter: Would an ordinary person, reading the matter complained of, be likely to understand it as an expression of the writer's opinion or as a declaration of an existing fact? An opinion may be so stated as to raise directly the inference of a factual basis, and the defense of fair comment usually has been held not to cover an opinion so stated." *Id.* at 274.

It quoted, at 280, *Odgers on Libel and Slander* 166 (6th ed. 1929):

"If the defendant accurately states what some public man has really done, and then asserts that 'such conduct is disgraceful,' this is merely the expression of his opinion, his comment on the plaintiff's conduct. So, if without setting it out, he identifies the conduct on which he comments by a clear reference. *In either case, the defendant enables his readers to judge for themselves how far his opinion is well founded; and, therefore, what would otherwise have been an allegation of fact becomes merely a comment.* But if he asserts that the plaintiff has been guilty of disgraceful conduct, and does not state what that conduct was, this is an allegation of fact for which there is no defense but privilege or truth." (emphasis added).

Citing, at 279, Section 606 of the Restatement of Torts (1938), the opinion summarized the elements of the defense of fair comment:

"[C]riticism as to matters of public concern and of the private conduct or character of one 'engaged in activities of public concern, in so far as his private conduct or character affects his public conduct, is privileged * * * although defamatory,' if it is upon a true statement of fact or upon facts otherwise known or readily available to the

recipient as a member of the general public, is the actual opinion of the critic, and is not made solely to harm the other (and in addition, is a comment 'a man of reasonable intelligence and judgment might make'). Comment (b) says:

> 'Comment or criticism is an expression of the opinion of the commentator or critic upon the facts commented upon or criticised. *If the facts are not known, a statement, though in form the expression of an opinion, carries with it the implication of facts to support it and is thus more than the mere expression of an opinion* (see § 567). To be privileged comment under the rule stated in this Section, therefore, the facts upon which the opinion is based must be stated or they must be known or readily available to the persons to whom the comment or criticism is addressed, as in the case of a newspaper criticism or a play or a review of a book. Moreover, *the facts upon which the criticism is based must either be true or, if untrue, the critic must be privileged to state them.*' "

In *Kirby,* the newspaper claimed that the lower court had erroneously instructed the jury that it could only consider facts stated and referred to in the editorial to determine whether the comment was fair and therefore immune from a libel action. Based upon the law quoted above, the Court upheld the instruction and affirmed the jury's determination that the editorial was *not* "fair comment".

The decision in *Kirby* makes it clear that comments, criticisms and opinions expressed concerning the activities of public officials or public figures are actionable in Maryland unless they qualify as "fair comment". *Kirby* was decided before *New York Times.* We take it that appellants contend that by creating a constitutional qualified privilege for false statements of fact, the Supreme Court immunized all expressions of opinion about individuals in the public official-public figure classification.

We do not read the Supreme Court decisions so broadly. Except for dictum in *Gertz*, nothing in *New York Times* or its progeny indicates that the Court has created an absolute privilege for all expressions of opinion on public matters and therefore eliminated the defense of "fair comment." [13] In fact, there is language in *New York Times* to the contrary, 376 U. S. at 292, n. 30:

> "Insofar as the proposition means only that the statements about police conduct libeled respondent by implicitly criticizing his ability to run the Police Department, recovery is also precluded in this case by the doctrine of fair comment. See American Law Institute, Restatement of Torts (1938), § 607. Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that *a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact.* Both defenses are of course defeasible if the public official proves actual malice, as was not done here." (emphasis added).

We think that the decision in *New York Times* had two major effects upon the defense of privilege regarding statements on matters of public concern. First, it created a qualified privilege for false statements of fact [14] concerning public officials and their activities. Second, by creating this constitutional privilege, it extended the defense of fair comment to include even opinions based upon false facts

---

13. In Garrison v. Louisiana, 379 U. S. 64, 77, footnote 10, the Court expressly stated that it did not reach the issue of "whether appellant's statement was factual or merely comment, or whether a State may provide any remedy, civil or criminal, if defamatory comment alone, however vituperative, is directed at public officials." The position espoused by Black, J. and Douglas, J. that criticism of public officials is absolutely privileged has never been adopted by a majority of the Court. Black, J. and Douglas, J. believed that "the First and Fourteenth Amendments not merely 'delimit' a State's power to award damages to 'public officials against critics of their official conduct' but completely prohibit a State from exercising such a power." *New York Times, supra,* at 293 (Black, J. concurring).

14. As indicated, only a minority of states extend fair comment to false statements of fact. Prosser, in the third edition of his *Law of Torts* § 110, at 815, published in 1964, stated that *New York Times* overthrew the majority position on fair comment and vindicated the minority position.

provided that such facts were not stated with actual malice, *i.e.*, with knowing falsity or with reckless disregard of their truth. Under the former rule as to the defense of fair comment, opinions were protected if the facts upon which they were based were truly stated or privileged.[15] *Kirby*, 227 Md. at 279. *Brush-Moore Newspapers, Inc. v. Pollitt*, 220 Md. 132, 138. By creating a qualified privilege for false statements of fact, the Supreme Court broadened the possible scope of the fair comment defense. It did not create an absolute privilege for all expressions of opinions. As we observed *supra*, in *New York Times*, at 292, n. 30, the Court acknowledged the continuing validity of the defense of fair comment as modified by the new constitutional privilege.[16]

The decision in *New York Times* also had an important procedural effect upon the law of defamation of public figures. Prior to the creation of a constitutional privilege, the law presumed that all defamation was false and the defendant had the burden of proving its truth. W. Prosser, *Law of Torts* § 116 at 798 (4th ed.. 1971). In order to protect the interest of the First Amendment in the free dissemination of information concerning the conduct of a public official or public figure, the Supreme Court shifted that burden. It is now incumbent upon the public official or public figure plaintiff to prove that the statements concerning his conduct were false, and that they were published with actual malice.[17] Because the defense of fair comment is also based on free speech principles,[18] the

15. "[T]he facts upon which the criticism is based must either be true or, if untrue, the critic must be privileged to state them. In the case of a defamatory opinion expressed upon a false statement of fact, the critic, to escape liability, must show the privileged character of the statement of fact, and, in addition, show that the criticism or comment thereon is privileged under the rule stated in this Section." Restatement, *supra*, § 606, comment b.

16. See *Butts, supra* at 152, footnote 18, where Harlan, J., distinguished between absolute and qualified privileges designed to foster free communication and classified fair comment among the latter.

17. "[T]he defamed public official or public figure must prove not only that the publication is false but that it was knowingly so or was circulated with reckless disregard for its truth or falsity." *Cox, infra*, U. S., 95 S. Ct. at 1043-1044.

18. "This principle [fair comment] is of the greatest importance to a democratic society which enjoys the traditions of free speech." Harper & James, *supra* § 5.28 at 456.

burden is on the public official or public figure plaintiff to prove the falsity of the facts underlying the opinion and, provided such facts are false, the actual malice of the defendant. In order to provide maximum protection for the free speech rights of defendants, the plaintiff's burden is not the ordinary one of preponderance of the evidence, but as we indicated *supra*, one of clear and convincing proof.

We hold that expressions of opinion, as well as statements of fact, concerning public officials and public figures can be actionable. Each, however, is under the protection of the constitutional privilege of *New York Times*.[19] True statements of fact concerning the conduct of public figures are absolutely privileged.[20] *A. S. Abell Co. v. Barnes, supra* at 59. False statements of fact are protected if not knowingly false or not published with reckless disregard of their truth or falsity. Fair and honest opinions which are based upon *true* facts and which have some relation to or connection with those facts [21] are also absolutely privileged.[22] Opinions

---

**19.** We preserve the distinction between assertions of fact on one hand and opinions, comments and criticism on the other hand because fair and honest commentary, by its very nature, deserves special protection in a free society. As Harper & James, *supra*. § 5.28 at 458 point out, an individual is not actually libeled by opinions based on supporting facts: "If the actual facts are accurately stated, an opinion based thereon will be understood as such and taken for what it is worth. In such a case the writer may, by expressing his opinion, 'libel himself rather than the subject of his remarks'." See also § 5.8 at 370. The special status afforded opinions under the defense of fair comment, however, is not without its detractors. See Titus, *Statement of Fact Versus Statement of Opinion — A Spurious Dispute in Fair Comment*, 15 Vand. L. R. 1203 (1962).

**20.** But see Cox Broadcasting Corporation v. Cohn, 420 U. S. 469, 95 S. Ct. 1029, which suggests that under some circumstances, true facts may be protected by the right of privacy.

**21.** In *Kirby, supra* at 279, the Court cited the Restatement for the

---

**22.** Constitutional privilege focuses on the truth or falsity of the material published, not on the defamer's attitudes toward the person defamed. *See* Cantrell v. Forrest City Publishing Co., 419 U. S. 245, 95 S. Ct. 465, 470. Because the Constitution requires that truth be recognized as a defense in a defamation action brought by a public figure, *Cox, supra*, at 1044, statements of opinion based on true facts, must be protected even if made with "common law" malice, *i.e.*, published with ill will or solely to harm the person defamed. Consequently, *if* the factual basis for the opinion is true, the defense of "fair comment", as extended by *New York Times* and its progeny, cannot be forfeited because "the publication is made solely from spite or ill will and for the purpose of causing harm to the person criticized. . . ." Restatement, *supra*, § 606, comment d. The defendant's attitude, however, will be relevant with regard to punitive damages.

based on false facts are protected if the publisher was not guilty of actual malice with regard to these supportive facts.[23]

proposition that an opinion, in order to be immune, had to be one that "a man of reasonable intelligence and judgment might make". This qualification, however, only applies when the criticism involves the *private* conduct of persons engaged in activities of public concern. See § 606 (2). Comment c clearly points out that when the opinions concern public conduct [§ 606 (1)], it is only required "that the comment have some relation to the facts upon which it is made.":

> "To be privileged under the statement in Subsection (1), the criticism need not express an opinion with which any person of reasonable intelligence and judgment could possibly agree. Unlike a personal attack upon a public man, as to which see Subsection (2), the fact that the comment or criticism is one which is not reasonably warranted by the facts upon which it is based is immaterial. If the public is to be aided in forming its judgment upon matters of public interest by a free interchange of opinions, it is essential that honest criticism and comment, no matter how foolish or prejudiced, be privileged. The fact that the criticism is fantastic is immaterial, and the extravagant form of its expression is unimportant."

Harper & James, *supra*, § 5.28 at p. 460, believe that, although fair comment need not be a sound or reasonable opinion, "it must have some connection with the stated or known facts."

**23.** Restatement (Second) of Torts (Tent. Draft No. 20, 1974) is not in complete accord with our view. The Tentative Draft agrees that the Supreme Court has not yet faced the issue of constitutional protection of expressions of opinion:

> "In the Supreme Court cases treating the constitutional limitation on defamation actions for communication on matters of public or general interest, it has been assumed that the Court was dealing with misstatements of fact and little consideration has been given to criticisms, or mere expressions of opinion. There seems little reason to doubt that the constitutional protection for free speech and free press will extend to the expression of opinions and criticism." § 581A, comment i.

It therefore concludes that the application of the actual malice standard to opinions "is not now certain and must await further elucidation by the Supreme Court." *Id.* Although it states that the defense of fair comment has not been expressly abrogated by the Court, the Tentative Draft believes that defense to be inapplicable where the defense of constitutional privilege applies:

> "To the extent that the constitutional limitation applies to a particular action for defamation the existence or nonexistence of the privilege of fair comment is irrelevant. The only current significance, therefore, of this Section, and of §§ 607-610 as particular applications of it, is in a case in which the constitutional limitation is held not to apply but the privilege of fair comment is held to be broader and therefore is applicable. The determination of the extent of which there may be cases of this type must await further development of the law. Pending that determination, §§ 606-610 have been retained in their original form." § 606, comment

We believe that comments, criticisms and opinions concerning the involvement of public persons in matters of public or general interest or concern are within the protection of the constitutional privilege. When such commentary is *not* based upon stated facts or upon facts otherwise known or readily available to the general public, it is treated as a factual statement and possible constitutional immunity is determined on that basis. Where the statements, however, are actual expressions of opinion, based upon stated or readily known facts, their objective truth or falsity depends on the veracity of these underlying facts. Therefore, any determinations with regard to falsity or the presence of actual malice must look to the stated or known facts which form the basis for the opinion:

> "A statement of fact is one capable of the quality of truth or falsity. A statement of opinion does not have this quality. Shortly speaking, therefore, an opinion is never 'true' or 'false' in the same sense as a statement of fact. An opinion is a comment on or an interpretation of fact. It is always related to the facts it purports to interpret. Depending on its conformity with sound critical standards, the opinion may be 'sound' or 'unsound,' 'good' or 'bad,' 'reasonable' or 'unreasonable,' but never 'true' or 'false.' " Harper & James, *supra*, § 5.8 at 370.

It is manifest on the record before us that the trial judge considered the rating of Dunn as an expression of opinion concerning the involvement of a public figure in a matter of public or general interest.[24] Although he considered the

---

If it is the position of the Tentative Draft that the fair comment method of testing expressions of opinions by examining the underlying facts is irrelevant, then we are not in accord. The *New York Times* test of truth and falsity cannot apply to the actual opinion itself but must look to the facts which form the basis for the opinion. As we have previously stated, we reject any suggestion that *New York Times* creates an absolute privilege for all expressions of opinion.

**24.** As indicated *supra*, we are in full accord with this view. The rating, as published with the article containing the profile of Peary High and an

defense of fair comment, the judge refused to take the case away from the jury on that basis. In his "Opinion and Order" denying appellants' motion for summary judgment, he outlined the fair comment defense prior to *New York Times*:

> "Under Maryland law, even before *New York Times*, the defense of fair comment could be made under the general issue plea but, generally, it could not be taken advantage of by demurrer. *Di Blasio v. Kolodner*, 233 Md. 512, 197 A. 2d, 245 (1964); *Carr v. Watkins*, 227 Md. 578; 177 A. 2d, 245 (1962). However, a defamatory *misstatement* of fact could not be defended successfully as fair comment in libel actions. To sustain this defense, facts which were set out in the publication had to be correctly stated if not privileged and any facts not set out had to be both true and referred to in the publication so as to be either recognizable or be made identifiable and easily accessible. *A. S. Abell Co. v. Kirby*, 227 Md. 267; 176 A. 2d, 340; 90 A.L.R.2d, 1264 (1962). Cf. *Brush-Moore Newspapers, Inc. v. Pollitt*, 220 Md. 132; 151 A. 2d 530 (1959)."

In the circumstances, however, the trial judge found the defense to be inappropriate as a vehicle for summary judgment:

> "The body of the article concerning the Peary High School of which the plaintiff is principal, contains twelve short paragraphs describing mainly the strict discipline of the school, certain controversial actions of the plaintiff with respect to censorship of the school newspaper and the barring of certain speakers at a student arranged seminar together with a claim that 'the tone of the school set by Principal Dr. Fred. L. Dunn is disciplined

---

introduction setting out the source material for the article and the basis for the rating, satisfied the criteria for fair and honest expressions of opinion as set forth in *Kirby, supra.*

education.' It is stated that many parents in the community are pleased with the plaintiff's handling of the school. *No facts are set forth in the article warranting more than a finding that the plaintiff is a controversial principal.* Thus, there was no more of a factual basis stated or referred to for a rating of 'unsuited' than there was for a description of 'infamous' in *Kirby, supra.* It may be noted that the one other principal rated as unsuited seemed, also, from the article describing his school, to be a strict disciplinarian.

Being controversial because of being strict seems hardly a basis for a charge of being unsuited. In the field of education almost everyone and everything is controversial and from this it seems clear that under Maryland law, apart from the recent decisions of the Supreme Court, this case would be submitted to the jury under appropriate instructions relating to libel per se, fair comment and malice as was done in *Kirby,* supra." [25] (emphasis added).

During the argument on appellant's motion for a directed verdict, at the close of Dunn's case, the trial judge again considered the *Kirby* case and the defense of fair comment:

"Now, didn't the Court of Appeals deal with this question of a statement — *of opinion statements such as here* a number of years ago and I think Chief Judge Hammond repeated it that if a person is going to express an opinion about the qualities of a person in his professional or business capacity then the article must truthfully state such facts on which a reasonable person could come to such a conclusion?" (emphasis added).

**25.** We note that the instructions to the jury did not deal directly with the defense of fair comment, but concentrated on the constitutional privilege as outlined in *New York Times.* The lower court apparently determined that the defense of "fair comment" had been subsumed by the privilege created by *New York Times.*

The judge reserved his decision on the motion but expressed a strong inclination to submit the issues to the jury. When appellants renewed their motion at the close of all the evidence, the judge again reserved his decision and submitted the case to the jury. He eventually upheld the jury's verdict for appellants by denying defendants' motion for judgment *n.o.v.*[26]

Considering, as we must in determining the propriety of the denial of a motion for a directed verdict, the evidence in light most favorable to the party against whom the motion is directed, and making our own constitutional appraisal of it, we find that the lower court erred when it denied appellants' motion for a directed verdict. First, except for the statement that the school newspaper was "heavily censored", Dunn failed to provide sufficient evidence for the jury to find with convincing clarity that the article was false. Second, even assuming *arguendo* that a jury question was presented with regard to the falsity of the article, Dunn failed to show by clear and convincing evidence that it was published with actual malice. There was no legally sufficient evidence whatsoever of knowing falsity. Dunn's evidence of conduct amounting to reckless disregard does not satisfy the definitions of that term set out in the Supreme Court decisions. Dunn was obliged to overcome the legal immunity for the honest expression of opinion in matters of legitimate public interest by proving by clear and convincing evidence that the underlying facts, and thus the opinion itself, were false, and, if false, that appellants, as responsible for the opinion, knew the facts were false or recklessly disregarded their truth or falsity.[27] Because Dunn failed to meet this

---

**26.** The docket entries under the date of 5 March 1974 read as follows: "Hearing on Motion for Judgment N.O.V. and for New Trial had before this Court . . . and same day Motion for Judgment N.O.V. overruled." Because the record contains neither a transcript of that hearing nor a memorandum opinion concerning the motion, we do not know the reasons for denying the motion.

**27.** The Court said in Cox Broadcasting Corp. v. Cohn, *supra*, at 1043-1044, that the message of *New York Times* and its progeny was that "the defense of truth is constitutionally required where the subject of the publication is a public official or public figure. What is more, the defamed public official or figure must prove not only that the publication is false but that it was knowingly so or was circulated with reckless disregard for its truth or falsity."

burden, the court below should not have submitted the case to the jury.[28]

## PROOF OF FALSITY

We have no difficulty whatsoever in determining that the proof presented to show falsity lacked the clear and convincing quality which the constitutional standard demands. We explain why.

The article based the unsuited rating of Dunn on the following statements: (1) the tone of "disciplined education" set by Dunn; (2) the institution of few, if any, innovative programs; (3) student and parent complaints concerning the "stifling and boring" atmosphere at Peary and the "open hostility" between many students and Dunn; (4) teacher dissatisfaction and harassment; (5) censorship of the school newspaper; (6) the transfer recommendation; and (7) the speaker ban and the resultant "protest march" to school board headquarters.

When Dunn took the stand at the opening of his case, the questioning by his counsel was directed at discrediting these statements. Although he attempted to explain the circumstances surrounding (6) and (7), Dunn admitted that Dr. Elseroad, the Superintendent of Schools, had recommended his transfer to a junior high school and that his banning of certain speakers at a student function had resulted in a march of "around 300" students. Although Dunn testified that he "always got along pretty well with the students", he admitted that "1970-71 was a particularly rough year" and that the students were a "little testy". This admission was an understatement concerning the uncontradicted evidence of the protest march and friction with the yearbook and school newspaper staffs and the Student Government Association (SGA). Dunn testified that he hoped to have a "nice relationship" with the SGA but that "it didn't work out that way." Evidence that the relationship

---

**28.** The lower court obviously did not consider the impact of *New York Times* and its progeny on the defense of "fair comment". It also made the erroneous determination that the opinion must be warranted by the stated facts. See note 21 *supra*.

was anything but "nice" was abundant. Dunn and the SGA disagreed over the resolution of several issues, such as voluntary assemblies, the "open campus" proposal and voter registration for school elections. The latter controversy was, according to Dunn, a "cause celebre." When the issue of Dunn's possible transfer was considered by the SGA, it recommended transfer by a vote of 48 to 2. With regard to his relationship with the parents, Dunn testified that there was a "small group who . . . no matter what you do or what you try to do are going to find fault." He said that the P.T.A. was "argumentative in the sense that people would come in and express themselves." Concerning his relationship with the teachers, Dunn said that he "got along professionally, satisfactorily, with the overwhelming majority of them [80 to 90%]." This estimate, however, still results in an unsatisfactory relationship with 10 to 20% of the faculty. Dunn's figures appear somewhat overestimated in view of his admitted problems with the faculty in general and the English Department in particular. During the school year 1970-71, the faculty "lodged a grievance with the Superintendent under the Grievance Procedure" protesting the double-period scheduling at Peary. That same year, the *entire* English Department filed a "petition" with Dunn and "sent copies to Dr. Snodgrass [Dunn's immediate superior] and several other people." This petition was introduced into evidence as a defense exhibit and read aloud to the jury. It listed several items "which we believe need the immediate attention of those charged with administering Robert E. Peary High School — the Area Director, the principal, and the three assistant principals." Item Four recommended that "[t]he administration should try to do a better job of communicating with the faculty" and gave seven examples of lack of communication. Item Five requested that "the administration work toward improving the climate in which teachers work." Section C of Item Five reads as follows: "We believe the respect accorded to teachers by the administration directly affects the relationship between the teacher and his students. We believe that, currently, students are aware that there is a lack of respect by

administration for faculty members." Dunn did not dispute the accuracy of the statement attributed to the director of employee relations for teachers concerning harassment through teacher evaluations. This atmosphere of disagreement surrounding the relationship between Dunn and the students, teachers and parents was recognized by the lower court. During the cross-examination of Dunn, an objection was made to a line of questioning concerning Dunn's opposition to student involvement in the P.T.A. The objection was discussed at a bench conference out of the hearing of the jury:

> "MR. DOYLE [Defense Counsel]: The proffer is that the question would tend to raise the issue that on each of these areas where Dr. Dunn disagreed with the students, there were groups of students and parents and teachers who disagreed.
> THE COURT: I think that would be conceded — he's already conceded that."

Dunn testified that he was not a "strict disciplinarian." We note, however, that he prepared a written statement which he read to the School Board when it was considering his transfer. In this statement, which he introduced at trial and read aloud to the jury, Dunn listed "my desire to control the educational atmosphere of the school [which] would be better suited to a junior high school" as one of the two reasons given him by Superintendent Esleroad for recommending his transfer. In addition, Dunn never disputed the statements in the article concerning the activities of his assistant principals during lunch periods. He also never directly disputed the charge of lack of innovation. During direct examination, when he discussed his in-school interview with Bancroft, he did not attack the article's assertion that he admitted "that there have been few changes in the curriculum at Peary."

This evidence, lacking as it did a showing with convincing clarity that the facts underlying the rating were false, could not constitutionally sustain the judgment.

## PROOF OF ACTUAL MALICE

Even if the underlying facts of the defamatory publication were false, Dunn failed to present clear and convincing evidence that appellants acted with actual malice.

Dunn claims that reckless disregard of the truth was shown by the following conduct on the part of the defendants:

"(1) The attempt to undertake a rating of professional educators without personal expertise or the assistance of experts.

(2) The adoption of vague and invalid standards designed to meet the Defendants' apparent preconceived feelings about public education.

(3) The attempt to make a comparative rating of principals or rate them against each other.

(4) The failure of the Defendants to apply their own inept and vague standards in the rating process."

Assuming, *arguendo*, that Dunn proved by clear and convincing evidence that appellants did as he suggests, we disagree that such conduct amounted to reckless disregard of the truth. "Reckless disregard" in the constitutional sense is concerned primarily with the defamer's attitude toward the truth or falsity of his statements, not with his animosity toward the person defamed or the way in which the defamation is accomplished. This emphasis is best expressed in *St. Amant v. Thompson*, 390 U. S. 727, where a verdict for the plaintiff Thompson was overturned because he failed to meet his burden of proof with regard to actual malice. The evidence of reckless disregard which the state court relied upon, including St. Amant's failure to verify his information and his publication of the defamation "heedless of the consequences", was found, at 730-731, insufficient to meet the constitutional standard:

"These considerations fall short of proving St. Amant's reckless disregard for the accuracy of his statements about Thompson. 'Reckless disregard,'

it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times*, supra, the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In Garrison v. State of Louisiana, 379 U. S. 64, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of * * * probable falsity.' 379 U. S., at 74, 85 S. Ct., at 216. Mr. Justice Harlan's opinion in Curtis Publishing Co. v. Butts, 388 U. S. 130, 153, 87 S. Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967), stated that evidence of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity' was essential to recovery by public officials in defamation actions. *These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (emphasis added).

The test for "reckless disregard", first announced in *St. Amant,* has been iterated and reiterated in subsequent decisions of the Supreme Court. In *Rosenbloom, supra,* at 56-57, the language from *St. Amant* concerning failure to

investigate was quoted and the Court found that there was "no evidence in the record to support a conclusion that respondent 'in fact entertained any serious doubts as to the truth' of its reports." [29] In *Gertz, supra,* an article appeared in *American Opinion,* a monthly expressing the views of the John Birch Society, and which was published by Robert Welch, Inc. It contained a false and vicious attack upon Elmer Gertz, a reputable Chicago attorney. The article portrayed Gertz as the architect of the "frame up" of a policeman. It implied that Gertz had a criminal record and stated that he had been an official of a subversive Marxist organization and an officer of the National Lawyers Guild, described as a communist group which planned the 1968 demonstrations in Chicago. It labeled him as a "Leninist" and a "Communist-fronter". The managing editor of *American Opinion* made no effort to verify or substantiate the charges against Gertz. At the subsequent libel trial, he testified that he had no knowledge of the falsity of the article and that he had relied on the reputation of the author and on his prior experience with the accuracy and authenticity of the author's previous contributions. *Id.* at 325-328. The District Court and the Court of Appeals both found that Gertz had failed to show by clear and convincing evidence that the publisher, Robert Welch, Inc., had acted with *New York Times* malice. The Supreme Court, again quoting from *St. Amant,* agreed with this determination: "There was no evidence that the managing editor of *American Opinion* knew of the falsity of the accusations

---

**29.** In *Rosenbloom,* a magazine distributor sued a radio station for libel arising from certain broadcast news reports concerning his involvement in the sale of obscene materials. The Court applied the constitutional privilege of *New York Times* and found that the distributor failed to meet his burden of proof:

> "Our independent analysis of the record leads us to agree with the Court of Appeals that none of the proofs, considered either singly or cumulatively, satisfies the constitutional standard with the convincing clarity necessary to raise a jury question whether the defamatory falsehoods were broadcast with knowledge that they were false or with reckless disregard of whether they were false or not." *Id.* at 55.

The Court rejected the distributor's argument that the station's "failure to communicate with him to learn his side of the case and to obtain a copy of the magazine for examination sufficed to support a verdict under the *New York Times* standard." *Id.* at 56.

made in the article. In fact, he knew nothing about [Gertz] except what he learned from the article. The court correctly noted that mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, the publisher must act with a 'high degree of awareness of . . . probable falsity.' . . . The evidence in this case did not reveal that [Welch] had cause for such an awareness." *Id.* at 332.

Although the test for reckless disregard does not avail itself of easy application, one point is clear: mere failure to investigate, in and of itself, is not sufficient evidence under the *New York Times* privilege. Consultation with experts is just one aspect of an overall investigation into the veracity of the source material for an article. See *Curtis, supra.*[30] Since failure to investigate cannot satisfy the constitutional test of reckless disregard, we cannot perceive how mere failure to seek the assistance of educational experts, without more, could satisfy that standard. Although failure to check source material with experts may be one instance in a pattern of conduct showing complete disregard for the truth, see *Curtis, supra,* at 158, and *Goldwater v. Ginzburg,* 414 F. 2d 324, 330 (2nd Cir. 1969), we find no such pattern in the instant case.[31]

---

**30.** The plurality opinion of Harlan, J. (joined by Clark, J. and Stewart, J.) advocated a less stringent test with regard to the application of the *New York Times* privilege to public figures as opposed to public officials. They affirmed a verdict against the publisher based on "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers." *Curtis, supra,* at 155. The plurality opinion upheld the jury's finding that the investigation undertaken by the publisher was "grossly inadequate in the circumstances." *Id.* at 156. The opinion outlined a series of acts which it found to be "highly unreasonable conduct" including failure "to check the story with someone knowledgeable in the sport [football]." *Id.* at 158. Although the test advocated by the plurality in *Curtis* was not applied to public figures in subsequent cases, the acts of the publisher in that case, when considered *in their cumulative effect,* went beyond "highly unreasonable conduct" to "actual malice". See the concurring opinion of Warren, C.J., who rejected the plurality test in favor of the *New York Times* test in the context of public figure defamation and found it satisfied in the factual situation of *Curtis.* He emphasized that the "slipshod and sketchy investigatory techniques" were augmented by the failure to make inquiries after the editors were notified by Butts and his daughter that the account to be published was absolutely untrue. *Id* at 169-170.

**31.** See note 30, *supra.* The Sentinel stated that it was rating the principals itself based on school visitations, observations of the principals

Dunn's charges that the appellants rated him without personal expertise, that they adopted vague and invalid standards designed to meet their own preconceptions about public education, and that they failed to apply their own inept standards, goes only to the reasonableness of the opinion expressed. As we have stated earlier,[32] where an opinion is expressed concerning the public conduct of a public figure, the defense of fair comment does not demand that the opinion be one that a reasonable man would make but only that it have some relation to or connection with the underlying facts. At the very least, the rating given Dunn was related to or connected with the article on Peary High.[33] In addition, actual malice demands more than a showing of unreasonable conduct. If Dunn had proved that appellants deliberately employed slanted and fabricated standards and applied them to produce a false impression of his professional abilities, see *Goldwater v. Ginzburg, supra,* this would be evidence of reckless disregard of the truth and possibly knowing falsity. At best, however, Dunn's proof establishes that the defendants employed unclear standards in a careless manner. See *Harnish v. Herald-Mail Co.,* 264 Md. 326, 336. Negligent application of standards does not amount to actual malice.[34] Dunn argues that the

and interviews with students, faculty, parents and the principals themselves. Compare that situation with *Goldwater, supra,* where the publisher attempted to make it appear that his evaluations were based on expert authority. Compare also with *Curtis,* where the publisher knew that the source of its information was a person who had been placed on probation in connection with bad check charges.

**32.** See note 21, *supra.*

**33.** If an individual publishes an unreasonable opinion based on vague and invalid standards he libels himself and not the object of his opinion. Readers who advocate a traditional approach to education might well have rated Dunn "outstanding" and The Sentinel "unsuited" after they read the article. As the article itself points out, many parents supported Dunn's "policies on discipline."

**34.** In his brief Dunn contends that the "defendants' failure to apply their own standards was reckless." He lists five "positive factors" which Bancroft testified at trial formed the basis for the rating:

"a. A broad diversified curriculum established to stimulate the student's interest while still giving them a sound education.

b. Discipline problems handled in a manner which would alleviate the cause of the problem and thus prevents its recurrence while still maintaining reasonable order in the school.

c. The schools should work in harmony with its community to

comparative rating was reckless because the different situations at the individual schools made it impossible to rate one principalship against another. He charges that the rating was like comparing "apples to oranges". This contention again goes to the reasonableness of the opinion. We do not see how comparing apples to oranges could ever amount to actual malice.

The short of it is, even assuming that the rating was a false statement of fact or an opinion based on false facts, Dunn did not prove by clear and convincing evidence that appellants published the rating with a high degree of awareness of its probable falsity or that they entertained serious doubts as to its truth.

## DECISION

The test for reckless disregard as announced in *St. Amant* and followed in subsequent decisions is a "harsh one and proof under it is difficult." *Barnes, supra,* at 81. Dunn, however, failed to meet it. As a principal of a public senior high school, he was in a sensitive position open to public criticism secured by the protection of free speech. Unless he showed that such protection was abused in the constitutional sense, he cannot recover for hurt sustained as a result of that criticism. The First Amendment demands that recovery may be had for such criticism even when injurious to reputation, only when the critics have been guilty of actual malice. The judgments must be reversed.

The case was tried in the full glare of *New York Times* and its progeny. To show actual malice Dunn attacked the

---

achieve educational goals and should not cause dissent and discord which could interrupt the educational process.

d. Parents and students should be content with the high school.

e. Few teachers should request transfers or in other ways express dissatisfaction."

He gave five examples, including Peary, where the rating "bears virtually no resemblance" to the above quoted factors. Applying these standards to the facts as stated in the article, we find the rating of Dunn to be highly reasonable *on that basis*. It is immaterial to Dunn's suit whether the other four ratings are examples of reckless application of standards (assuming that such conduct would satisfy the test of reckless disregard, which we doubt).

546

validity of the facts of the defamatory article. As we have indicated, he was able to establish falsity only in one instance — censorship of the school newspaper. There was evidence that this false statement was based upon erroneous information supplied by members of the staff of the school paper and the faculty adviser. Thus, the statement was not made with actual malice in any event. Dunn had ample opportunity to prove that appellants abused their constitutional privilege and failed to do so. In the circumstances, we do not think that he is entitled to a remand for the purpose of supplying proof, if he could, of actual malice in the constitutional sense. *A. S. Abell Co. v. Barnes, supra,* at 80-81.

In the light of our decision we do not reach other contentions presented. We appreciate the interest of appellants in the propriety of the trial court's ruling relating to the disclosure of news sources, but the applicability of Code, Art. 35, § 2 to circumstances such as were here existent must await an interpretation that will not be merely *obiter dictum*.

*Judgments reversed; costs to be paid by appellees.*